1  | A. Brooks Gresham SBN 155954
   | bgresham@mcguirewoods.com
2  | Tracy Evans Moyer SBN 243212
3  | tmoyer@mcguirewoods.com
   | MCGUIRE WOODS LLP
4  | 1800 Century Park East, 8th Floor
   | Los Angeles, California 90067
5  | Tel:  310-315-8200
   | Fax: 310-315-8210
6  |
7  | Mitchell A. Lowenthal (*pro hac vice*
   | forthcoming)
8  | mlowenthal@cleary.com
   | Meredith E. Kotler (*pro hac vice*
9  | forthcoming)
   | mkotler@cleary.com
10 | **CLEARY GOTTLIEB STEEN &**
   | **HAMILTON LLP**
11 | One Liberty Plaza
   | New York, NY 10006
12 |
13 | *Attorneys for Defendants*
   | Bank of America Corp., NB Holdings
14 | Corporation, BAC Home Loan
   | Servicing, L.P, Bank of America
15 | Mortgage Securities, Inc., and Banc of
   | America Securities, LLC
16 | SPECIAL APPEARANCE

**FILED**
CLERK, U.S. DISTRICT COURT

**JUL 2 7 2011**

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERATED INVESTMENT MANAGEMENT COMPANY; FEDERATED ULTRASHORT BOND FUND; FEDERATED FUND FOR U.S. GOVERNMENT SECURITIES; FEDERATED GOVERNMENT INCOME SECURITIES, INC.; and FEDERATED MORTGAGE CORE PORTFOLIO, | Case No. LACV11-6208 JAK(VBKx) |
| *Plaintiffs,* | **BANK OF AMERICA DEFENDANTS' NOTICE OF REMOVAL** |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOAN SERVICING, L.P.; COUNTRYWIDE | |

---

BANK OF AMERICA DEFENDANTS' NOTICE OF REMOVAL

1    CAPITAL MARKETS; CWALT, INC.;
CWMBS, INC.; BANK OF AMERICA
2    MORTGAGE SECURITIES, INC.;
BANK OF AMERICA CORP.; BAC
3    HOME LOAN SERVICING, L.P.; NB
HOLDINGS CORPORATION; BANC
4    OF AMERICA SECURITIES, LLC;
COUNTRYWIDE SECURITIES
5    CORPORATION; LEHMAN
BROTHERS INC.; GREENWICH
6    CAPITAL MARKETS, INC. A.K.A.
RBS GREENWICH CAPITAL;
7    MORGAN STANLEY & CO., INC.;
UBS SECURITIES LLC; ANGELO
8    MOZILO; DAVID A. SAMBOL;
DAVID A. SPECTOR; ERIC P.
9    SIERACKI; STANFORD KURLAND;
JOSHUA ADLER; RANJIT
10    KRIPALANI; and JENNIFER S.
SANDEFUR,
11
12          *Defendants.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that, on this date, Defendants Bank of America Corp., NB Holdings Corporation, BAC Home Loan Servicing, L.P, Bank of America Mortgage Securities, Inc., and Banc of America Securities, LLC (collectively, the "Bank of America Defendants"), by and through their undersigned attorneys, hereby remove Case No. BC465659, filed in the Superior Court of California, Los Angeles, and all claims and causes of action therein (the "Action"), to the United States District Court for the Central District of California.[1] As grounds for removal, the Bank of America Defendants state that this Court has original jurisdiction over this matter under 28 U.S.C. § 1332 on the basis of diversity jurisdiction, and that all the claims and causes of action in the matter may be removed to this Court under 28 U.S.C. §§ 1441 and 1446.

## I.   PROCEDURAL HISTORY AND TIMELINESS OF REMOVAL

1.    On or about July 18, 2011, Plaintiffs Federated Investment Management Company, Federated Ultrashort Bond Fund, Federated Fund for U.S. Government Securities, Inc., Federated Government Income Securities, Inc., and Federated Mortgage Core Portfolio (collectively, "Plaintiffs") filed a summons and a complaint (the "Complaint") in this action in the Superior Court of the State of California in the County of Los Angeles.  The case, entitled *Federated Investment Management Company, et al., v. Countrywide Financial Corporation, et al.* (the "Action"), was assigned case number BC465659.  A case management conference has been scheduled for November 2011.  No further proceedings have occurred in the Action.

2.    Neither the Bank of America Defendants nor any other defendant has yet been served with the Complaint in the Action.  A copy of all process, pleadings, and orders in the Action that are available from the court at this time is attached hereto as

---

[1]  The Bank of America Defendants specially appear only for the purpose of removal.  They reserve all defenses, jurisdictional and otherwise, available to them.

1  Exhibit 1.

2       3.      The Complaint alleges, among other things, that certain prospectuses and

3  other offering materials filed in connection with six residential mortgage-backed

4  securities ("MBS") issued by one or more subsidiaries of Countrywide Financial

5  Corporation and one MBS sold by one or more subsidiaries of Bank of America

6  Corporation, identified by Plaintiffs in Paragraph 65 of the Complaint, contained

7  misstatements and omissions in violation of Sections 11, 12, and 15 of the Securities

8  Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, in violation of the

9  California Corporations Code §§ 25400, 25401, 25500, 25501 and 25504, and in

10  violation of the California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, as well as the

11  common law.[2]  The Bank of America Defendants dispute that they have any liability

12  whatsoever to Plaintiffs.

13       4.      The Bank of America Defendants' time to answer the Complaint has not

14  expired, and none of the defendants has served or filed an answer in the Action.

15       5.      No motions or other proceedings in the Action are pending in the

16  Superior Court of Los Angeles County.

17       6.      This notice of removal is timely under 28 U.S.C. § 1446(b) because the

18  Complaint was filed on July 18, 2011.

19  **II.      REMOVAL IS PROPER UNDER 28 U.S.C. § 1332**

20       7.      This Court has original jurisdiction over this matter under 28 U.S.C.

21  § 1332 on the basis of diversity jurisdiction.

22       8.      This Action satisfies the complete diversity requirement. *See* 28 U.S.C.

23  § 1332(a)(1).  Defendants are citizens of California, Delaware, New York, Texas,

24  North Carolina, and Connecticut. *See* Compl. ¶¶ 22, 24, 26, 27, 28, 29, 33, 37, 38

25

26

---

27  [2] Plaintiffs do not assert claims under Sections 11, 12, and 15 of the Securities Act
    in connection with the one MBS issued by one or more subsidiaries of Bank of
28  America Corporation.

BANK OF AMERICA DEFENDANTS' NOTICE OF REMOVAL

1   39, 40, 41, 42, 43, 44, 46, 48, 49, 50, 51, 52, 53, 54.[3]   According to filings made by

2   them with the United States Securities & Exchange Commission, Plaintiffs

3   Federated Ultrashort Bond Fund, Federated Funds for U.S. Government Securities,

4   and Federated Government Income Securities, Inc. are Maryland corporations with

5   principal places of business in Pennsylvania.  The citizenship of Plaintiff Federated

6   Mortgage Core Portfolio may be disregarded because it is an unincorporated

7   association that is not a legal entity empowered to sue or be sued in its own name.

8   The citizenship of Federated Investment Management Company is also irrelevant as

9   a matter of law because it appears to have been improperly joined in the Action

10   solely to defeat diversity jurisdiction.  More specifically, the citizenship of

11   Federated Investment Management Company should be disregarded because it is not

12   alleged to have purchased any of the MBS at issue (Compl. ¶ 20), has no possibility

13   of recovering on any of its claim and has no legal right or standing to sue in this

14   action as a matter of law, and is consequently not a real party in interest to this

15   litigation.  *See, e.g., W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549

16   F.3d 100, 107-11 (2d Cir. 2008) (holding that investment advisor lacks standing to

17   assert claims for violations of the federal securities laws in its own name but on

18   behalf of its clients, the beneficial owners of the relevant securities); *O'Neil*

19   *Productions, Inc. v. ABC Sports, Inc.*, Civ. A. No. 06-10804, 2007 WL 1169357, at

20   *3 (E.D. La. Apr. 19, 2007) ("The improper joinder doctrine can be applied to the

21   alleged improper joinder of a non-diverse plaintiff" where "the non-diverse plaintiff

22   cannot state a cause of action against the defendants in state court (for example,

23   where the non-diverse plaintiff's claims are barred as a matter of law or the non-

24   diverse plaintiff is not a real party in interest.")).

25

26   [3] Effective July 1, 2011, BAC Home Loans Servicing, LP was merged into Bank of
     America, N.A.  Bank of America, N.A. is a citizen of Delaware and North Carolina.

27   Compl. ¶ 39.  Also, effective October 29, 2010, Banc of America Securities LLC
     was merged into Merrill Lynch Pierce Fenner & Smith, Inc., a citizen of Delaware

28   and New York.

3

9.   Plaintiffs claim to have purchased approximately $152 million of the seven MBS at issue in their Complaint (Compl. ¶ 65) and contend that they are entitled to substantial damages because the market value of the MBS has plunged. Compl. ¶¶ 14,260, 266.  As such, the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

10.   This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1441, because complete diversity of citizenship exists between Petitioner and all properly joined parties, and the amount in controversy, exclusive of interests and costs, exceeds $75,000.00.

11.   Because this Court has original subject matter jurisdiction over this action, and because no resident of the forum state has been "properly joined and served," and removal is appropriate under 28 U.S.C. § 1441(b).

**IV.   THERE IS NO BAR TO REMOVAL**

12.   Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), does not preclude removal under 28 U.S.C. § 1441 because there is no reasonable basis in fact or law or colorable ground for Plaintiffs' claims under the Securities Act and, as a result, they must be disregarded.

13.   Among other things, Plaintiffs' claims under the Securities Act are barred by Section 13 of the Securities Act, 15 U.S.C. § 77m, which provides that:

> No action shall be maintained to enforce any liability
> created under section 77k or 77l(a)(2) of this title unless
> brought within one year after the discovery of the untrue
> statement or the omission, or after such discovery should
> have been made by the exercise of reasonable diligence,
> or, if the action is to enforce a liability created under
> section 77l(a)(1) of this title, unless brought within one
> year after the violation upon which it is based.  In no event
> shall any such action be brought to enforce a liability

4

1             created under section 77k or 77l(a)(1) of this title more

2             than three years after the security was bona fide offered to

3             the public, or under section 77l(a)(2) of this title more than

4             three years after the sale.

5        14.     Because Plaintiffs filed this action more than three years after the date

6 of the MBS offerings at issue and the alleged dates of their MBS purchases (Compl.

7 ¶¶ 65, 76), their Securities Act claims are time-barred under Section 13 by the three-

8 year statute of repose.  Similarly, because Plaintiffs filed this action more than one

9 year after any alleged misstatements or omissions were discovered or should have

10 been discovered by the exercise of reasonable diligence (Compl. ¶¶ 276-80), their

11 Securities Act claims are time-barred under Section 13 by the one-year statute of

12 limitations.

13        15.     Plaintiffs have identified no basis for tolling.  The Complaint asserts no

14 basis to toll the statutes of repose or limitations as to BOAMS 2007-3.  Although

15 Plaintiffs assert (*see* Compl. ¶¶ 276-80) that the statutes of repose and limitations

16 are tolled as to the other six MBS that they allegedly purchased because those

17 securities were included in two previously filed class action complaints – *Luther, et*

18 *al. v. Countrywide Financial Corporation, et al.*, Lead Case No. BC 380698 (Cal.

19 Super. Ct. (Los Angeles County)) (filed Nov. 14, 2007), and *Washington State*

20 *Plumbing & Pipefitting Pension Trust v. Countrywide Fin. Corp., et al.*, Case No.

21 BC392571 (Cal. Super. Ct. (Los Angeles County)) (filed June 12, 2008) – Plaintiffs'

22 allegations are incorrect as a matter of law and must be rejected on their face.

23 *Luther* and *Washington State* did not toll the repose or limitations periods as to

24 CWHL 2005-21, CWHL 2006-OA5, CWHL 2007-14, CWHL 2007-17, and CWHL

25 207-18, because the *Luther* and *Washington State* plaintiffs did not purchase those

26 MBS and, therefore, lacked standing to assert Securities Act claims on them.  *Me.*

27 *State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166-67 (C.D. Cal.

28 2010).  *Luther* and *Washington State* did not toll the repose period as to CWALT

1    2005-51 because the statute of repose with respect to that security ran before a

2    named plaintiff with standing joined the *Luther* action.  As such, all Securities Act

3    claims as to that MBS were time-barred before any tolling could have possibly

4    begun.

5    **V.      PROCEDURAL REQUIREMENTS AND LOCAL RULES**

6        16.    Venue is proper under 28 U.S.C. § 1446(a), which provides for removal

7    of any civil action to the federal district court for the district and division embracing

8    the place where the action is pending.

9        17.    Pursuant to 28 U.S.C. § 1446(d), the Bank of America Defendants will

10   serve a copy of this Notice of Removal on counsel for Plaintiffs and will file a copy

11   with the Clerk of the Superior Court, County of Los Angeles.  Pursuant to 28 U.S.C. §

12   1446(a), and attached hereto as Exhibit 2, is a copy of a Notice of Filing of Notice of

13   Removal, which will be filed with the Clerk of the Superior Court of California,

14   County of Los Angeles.

15       18.    The Bank of America Defendants sign this Notice of Removal pursuant

16   to Rule 11 of the Federal Rules of Civil Procedure.  *See Destfino v. Reiswig*, 630 F.3d

17   952, 957 (9th Cir. 2011) ("Because none of the non-joining defendants was properly

18   served, their absence from the removal notice did not render the removal defective.").

19       19.    No other defendants named in the Action have yet been served, so their

20   consent to removal is not required.

21       20.    Accordingly, all of the requirements of 28 U.S.C. §§ 1332 and 1441(a)

22   have been satisfied, and this action may properly be removed to this Court.

23

24

25

26

27

28

BANK OF AMERICA DEFENDANTS' NOTICE OF REMOVAL

1    Dated:  July 27, 2011                MCGUIRE WOODS LLP

2

3                                         A. Brooks Gresham
                                          Tracy Evans Moyer
4                                         1800 Century Park East, 8th Floor
                                          Los Angeles, California 90067
5
                                          *Counsel for the Bank of America Defendants*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BANK OF AMERICA DEFENDANTS' NOTICE OF REMOVAL

**EXHIBIT  1**

1  BLECHER & COLLINS, P.C.
   Maxwell M. Blecher (State Bar No. 26202)
2     mblecher@blechercollins.com
   515 South Figueroa Street, Suite 1750
3  Los Angeles, California 90071-3334
   Tel.: (213) 622-4222 / Fax: (213) 622-1656

4  LOWEY DANNENBERG COHEN & HART, P.C.
5  Stephen Lowey
      slowey@lowey.com
6  Barbara Hart
      bhart@lowey.com
7  David Harrison
      dharrison@lowey.com
8  One North Broadway, Suite 509
   White Plains, NY 10601
9  Tel.: (914) 997-0500 / Fax: (914) 997-0035

10  Attorneys for Plaintiffs

11        SUPERIOR COURT OF THE STATE OF CALIFORNIA

12             FOR THE COUNTY OF LOS ANGELES

13  FEDERATED INVESTMENT MANAGEMENT
    COMPANY; FEDERATED ULTRASHORT BOND          Case No.   **BC 465659**
14  FUND; FEDERATED FUNDS FOR U.S.
    GOVERNMENT SECURITIES; FEDERATED            **COMPLAINT**
15  GOVERNMENT INCOME SECURITIES, INC.; and
    FEDERATED MORTGAGE CORE PORTFOLIO,
16
                                                **DEMAND FOR JURY TRIAL**
17                  *Plaintiffs,*

18             v.
    COUNTRYWIDE FINANCIAL CORPORATION;
19  COUNTRYWIDE HOME LOANS, INC.;
    COUNTRYWIDE HOME LOAN SERVICING, L.P.;
20  COUNTRYWIDE CAPITAL MARKETS; CWALT,
    INC.; CWMBS, INC.; BANK OF AMERICA
21  MORTGAGE SECURITIES, INC.; BANK OF
    AMERICA CORP.; BAC HOME LOAN
22  SERVICING, L.P.; NB HOLDING CORPORATION;
    BANC OF AMERICA SECURITIES LLC;
23  COUNTRYWIDE SECURITIES CORPORATION;
    LEHMAN BROTHERS INC.; GREENWICH CAPITAL
24  MARKETS, INC., a/k/a RBS GREENWICH CAPITAL;
    MORGAN STANLEY & CO., INC.; UBS
25  SECURITIES LLC; ANGELO MOZILO; DAVID A.
    SAMBOL; DAVID A. SPECTOR; ERIC P. SIERACKI,
26  STANFORD KURLAND; JOSHUA ADLER; RANJIT
    KRIPALANI; and JENNIFER S. SANDEFUR,
27
                  *Defendants.*
28

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

JUL 18 2011

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
      Mary Flores

{2481 / CMP / 00108800.DOC v1}              **COMPLAINT**

# TABLE OF CONTENTS

Page

I.    SUMMARY OF THE ACTION ............................................................................. 1

II.   JURISDICTION AND VENUE ............................................................................ 5

III.  PARTIES.......... ........................................................................................................ 5

      A.    Plaintiffs...... ............................................................................................... 5

      B.    Defendants ................................................................................................. 6

IV.   BACKGROUND .................................................................................................... 13

      A.    The Securitization Process ....................................................................... 13

V.    SUBSTANTIVE ALLEGATIONS......................................................................... 16

      A.    Plaintiff's Investment in the Certificates .................................................. 16

      B.    Important Factors in Plaintiff's Decision to Invest in the Certificates ................. 19

      C.    Countrywide Misrepresents its Mortgage Loan Underwriting Guidelines ........... 21

      D.    Countrywide Knowingly Abandoned its Underwriting Guidelines by
            Approving Extremely Risky Loans Through "Shadow Guidelines"
            and Other Undisclosed Exceptions.......................................................... 25

            1.    Countrywide's Undisclosed "Matching" Strategy Ensured That
                  Countrywide's Underwriting Guidelines Were the
                  "Most Aggressive" Guidelines in the Market ............................... 27

            2.    Countrywide's Secondary Markets Structured Loan Desk Abandoned
                  All Underwriting Standards, Approving Any Loan, Regardless Of Its
                  Credit Risk, As Long As The Loan Could Be Resold And Securitized ...... 29

            3.    The Rampant Use of Exceptions Was Well Known
                  Within Countrywide But Was Concealed From
                  Plaintiffs and Other Investors in the Certificates ......................... 32

      E.    Countrywide Knew that their Limited or Reduced Documentation Loans
            Were Not Prudently Underwritten and Were Likely to Suffer Significant
            Defaults and Deficiencies, But Concealed These Facts from
            Plaintiff and Other Investors in the Certificates ...................................... 36

      F.    Countrywide Retained the Best Quality Loans for Its Own Portfolio,
            Selling Only the Riskiest Loans to Plaintiff and Other Investors ...................... 44

i

G.   Countrywide Pressured Appraisers To Submit Falsified Appraisal Reports ........ 45

H.   The Credit Ratings Assigned to Countrywide's and Bank of America's
Certificates Materially Misrepresented the Credit Risk of the Certificates .......... 47

I.   Countrywide Misrepresented the Transfer of Good Title ..................................... 51

J.   Bank of America Adopts Countrywide's Corrupt Practices ................................. 54

VI.   DEFENDANTS' FALSE AND MISLEADING MATERIAL
MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ........... 54

A.   Defendants' False and Misleading Statements
Regarding Underwriting Guidelines.................................................................. 54

B.   Defendants' False and Misleading Statements Regarding the Standards
for Obtaining a Loan under the Reduced Documentation Programs and the
Percentage of Loans Granted Pursuant to Full-Documentation Procedures ........ 57

C.   Defendants' Untrue Statements and Omissions Regarding
Appraisals and LTV Ratios ............................................................................. 60

D.   Defendants Misrepresented the Maximum Debt-to-Income Ratio
Allowed for Pursuant to the Underwriting Guidelines.......................................... 61

E.   Defendants Materially Misrepresented the Accuracy of the
Credit Ratings Assigned to the Certificates ...................................................... 62

F.   Defendants Materially Misrepresented Countrywide's Transfer
of Good Title to the Mortgage Loans to the Issuing Trusts ................................. 63

G.   Misrepresentations Contained in Other Documents............................................ 64

VII.   BECAUSE OF DEFENDANTS' FRAUDULENT CONDUCT, PLAINTIFFS
HAVE SUFFERED LOSSES ON THEIR PURCHASES OF CERTIFICATES........... 64

VIII.   THE LIABILITY OF BANK OF AMERICA AS THE
SUCCESSOR-IN-INTEREST TO COUNTRYWIDE.................................................. 67

IX.   CAUSES OF ACTION FOR FRAUD................................................................... 69

FIRST CAUSE OF ACTION (Common Law Fraud)................................................. 69

SECOND CAUSE OF ACTION (Aiding and Abetting Fraud) ................................... 74

THIRD CAUSE OF ACTION (False Statement for the Purposes of
Inducing the Purchase or Sale of a Security) .................................................... 75

X.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT AND

ii

**COMPLAINT**

{2481 / CMP / 00108800.DOC v1}

FOR NEGLIGENT MISREPRESENTATION ................................................................ 75

A.   Overview of the Securities Act Claims ................................................. 76

B.   Tolling of the Statute Of Limitations for the Securities Act Claims .................... 77

C.   Defendants' Materially False Misstatements and
     Omissions in the Offering Documents ................................................. 80

     1.   Defendants' False and Misleading Statements
          Regarding Underwriting Guidelines ........................................... 80

     2.   Defendants' False and Misleading Statements Regarding the
          Standards for Obtaining a Loan under the Reduced
          Documentation Programs and the Percentage of Loans Granted
          Pursuant to Full-Documentation Procedures ................................... 83

     3.   Defendants' Untrue Statements and Omissions Regarding
          Appraisals and LTV Ratios ................................................... 85

     4.   Defendants Misrepresented the Maximum Debt-to-Income Ratio
          Allowed for Pursuant to the Underwriting Guidelines .......................... 86

     5.   Defendants Materially Misrepresented the Accuracy of the
          Credit Ratings Assigned to the Certificates ................................. 87

     6.   Defendants Materially Misrepresented Countrywide's
          Transfer of Good Title to the Mortgage Loans to the Issuing Trusts ........... 88

FIFTH CAUSE OF ACTION (Violation of Section 11 of the Securities Act) ............... 89

SIXTH CAUSE OF ACTION (Violation Of Section 12(a)(2)
of the Securities Act) ............................................................. 91

SEVENTH CAUSE OF ACTION (Violation of Section 15 of the Securities Act) ......... 92

EIGHTH CAUSE OF ACTION (Negligent Misrepresentation) ........................... 93

NINTH CAUSE OF ACTION (Untrue or Misleading Statements
in the Sale of Securities) ......................................................... 96

TENTH CAUSE OF ACTION (Successor and Vicarious Liability) ...................... 96

PRAYER FOR RELIEF ............................................................. 98

iii

1   Plaintiffs Federated Investment Management Company; Federated Ultrashort Bond Fund;

2   Federated Funds for U.S. Government Securities; Federated Government Income Securities Inc.;

3   and Federated Mortgage Core Portfolio, by and through their attorneys, bring this action pursuant to

4   California Corporate Securities Act, Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the

5   "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, the California Civil Code, and the common

6   law against Defendants Countrywide Financial Corporation ("Countrywide Financial");

7   Countrywide Home Loans, Inc.; Countrywide Home Loan Servicing, L.P.; Countrywide Capital

8   Markets; CWALT, Inc.; CWMBS, Inc.; Bank of America Corp. ("Bank of America"), BAC Home

9   Loan Servicing, L.P.; NB Holding Corporation, Banc of America Mortgage Securities, Inc.; Banc

10  of America Securities LLC; Countrywide Securities Corporation; Lehman Brothers Inc.; Greenwich

11  Capital Markets, Inc. a.k.a RBS Greenwich Capital ("RBS").; Morgan Stanley & Co., Inc.; UBS

12  Securities LLC ("UBS"); Angelo Mozilo; David A. Sambol; David A. Spector; Eric P. Sieracki,

13  Stanford Kurland; Joshua Adler; Ranjit Kripalani; and Jennifer S. Sandefur; and alleges as follows:

14  **I.    SUMMARY OF THE ACTION**

15       1.      This action arises out of Plaintiffs' purchases of more than $185 million principal

16  amount of mortgage-backed securities ("MBS") issued by affiliates of Countrywide Financial and

17  Bank of America Corp. (the "Certificates").  The Certificates are "securities" within the meaning of

18  the California Corporate Securities Act, the Securities Act of 1933 and the Securities Exchange Act

19  of 1934.

20       2.      The six MBS issued by Countrywide affiliates, as described herein and in Exhibit 1,

21  will be referred to as the "Countrywide MBS."  The MBS issued by Bank of America affiliates, as

22  described herein, will be referred to as the "Bank of America MBS."

23       3.      As a result of the material misrepresentations and omissions described herein,

24  Plaintiffs purchased securities that were far riskier than represented.  The Certificates were backed

25  by mortgages worth significantly less than represented that had been made to borrowers who were

26  dramatically less credit-worthy than had been represented.

27       4.      The Certificates entitled investors to receive monthly distributions of interest and

28  principal on cash flows from the mortgages held by the trusts.  The Certificates issued by each trust

1

{2481 / CMP / 00108800.DOC v1}                    **COMPLAINT**

1  were divided into several classes (or "tranches") that had different seniority, priority of payment,

2  exposure to default, and interest payment provisions.  Rating agencies, such as Moody's Investors

3  Service, Inc. ("Moody's"), Standard & Poor's Corporation ("S&P") and Fitch, Inc. ("Fitch") rated

4  the investment quality of all tranches of Certificates based on information provided by the

5  Defendants about the quality of the mortgages in each mortgage pool and the seniority of the

6  Certificate among the various Certificates issued by each trust.  The ratings, in part, determined the

7  price at which the Certificates were offered to investors.  At the time of Plaintiffs' purchases, the

8  Certificates had received the highest ratings available in terms of safety of principal and interest

9  payments.

10      5.      In selling the Certificates, Defendants prepared and filed with the Securities and

11 Exchange Commission (the "SEC") certain Registration Statements, Prospectus Supplements and

12 Prospectuses (together the "Offering Documents").  In these Offering Documents, Defendants

13 misrepresented the underwriting standards and guidelines used to originate the mortgages

14 underlying the Certificates, the nature of the appraisals used to determine the value of the

15 underlying properties, the mortgages' loan-to-value ("LTV") ratios, and other facts that were

16 material to Plaintiffs' investment decisions.

17      6.      Plaintiffs were initially included as part of the Countrywide class of MBS purchasers

18 pending in the Central District of California.  However, on November 4, 2010, Judge Pfaelzer

19 issued a decision holding that the named plaintiffs had standing only with respect to the 81 MBS

20 offerings they invested in.  *Maine State Retirement System v. Countrywide Financial Corp.*, 722 F.

21 Supp. 2d 1157, 1166-67 (C.D. Cal. 2010).  The court rejected the plaintiffs' contention that they

22 could represent class members who bought other Countrywide MBS offerings if the offerings

23 emanated from a common registration statement.  The net effect of the court's ruling is to narrow

24 the *Maine State* class and to exclude class members whose investments in Countrywide MBS are

25 not identical with those of the named plaintiffs.  *Id.*  On May 5, 2011 Judge Pfaelzer issued another

26 order stating that the plaintiffs only had standing to sue based on the tranches of the MBS offerings

27 they purchased.  *Maine State Retirement System v. Countrywide Financial Corp.* No. 2:10-cv-

28 000302, slip op. at 12 (C.D. Cal. May 5, 2011).

2

**COMPLAINT**

7.   As a result of the uncertainty generated by the court's rulings in *Maine State*, Plaintiffs were charged with investigating the alleged misconduct of Countrywide, and, if warranted, filing an action to pursue their individual claims under the 1933 Act, California Law and the common law.

8.   On June 29, 2011, Bank of America announced a proposed $8.5 billion settlement with a group of more than 20 large investors in order to resolve claims relating to Bank of America's obligation to repurchase loans that did not conform to the standards enumerated in the Offering Documents. This proposed settlement is the largest settlement by a financial services firm to date, exceeding the total profits of Bank of America since the onset of the financial crisis in 2008.

9.   On June 29, 2011, the Bank of New York Mellon, as trustee, filed a petition in the New York State Supreme Court for approval of the settlement. *See In the Matter of the Application of the Bank of New York Mellon*, 651786/2011. The proposed settlement included one or more MBS offerings purchased by Plaintiffs.

10.   On July 5, 2011, a group of investors called Walnut Place filed a petition seeking to intervene in the court proceeding to challenge the settlement. According to Walnut Place, the Countrywide Mortgage Loans in the 530 trusts currently have an unpaid principal balance of $221 billion. An additional $48 billion of loans have been liquidated from those trusts by foreclosure or similar procedures. The total principal value Countrywide could be required to repurchase is therefore $269 billion. Audits of Countrywide loan files initiated by Walnut Place revealed that as many as 90% of those loans breaches representations and warranties. According to Walnut Place, Countrywide may be liable to repurchase loans with unpaid principal balances of as much as $242 billion.

11.   As detailed in the July 12, 2011 article published by the New York Times entitled "Bank of America's Mortgage Deal Questioned," New York Attorney General Eric Schneiderman, along with a number of investors are challenging the proposed $8.5 billion settlement with Bank of America due to their inability to adequately evaluate the settlement offer given that they do not have access to the loan files and therefore cannot determine the number of nonconforming loans.

3

12.     Plaintiffs, like other investors, do not have access to the loan files underlying the MBS they purchased. However, due to the recently proposed Bank of America settlement agreement and the related press regarding the poor quality of the mortgage loans securing their Certificates, Plaintiffs have brought this action against Bank of America and Countrywide.

13.     The recently proposed settlement and the challenges to it presented by groups of investors along with the New York Attorney General, have brought to light Countrywide's fraudulent concealment regarding the true nature of the loans securing the Certificates Plaintiffs' purchased.

14.     As will be alleged in greater detail below, Bank of America and Countrywide severely compromised their underwriting standards in the expanding and highly profitable MBS market. As a result of the Defendants' failure to follow their underwriting standards and guidelines set forth in the Certificates' Offering Documents, delinquencies and defaults in the loan pools underlying the Certificates have skyrocketed. As of May 2011, the percentage of loans which are delinquent by 90+ days ranges from 10.91%- 59.36%. The market value of these Certificates has plunged in some cases to below $0.10 on the dollar.

15.     The poor loan performance and significant foreclosures have caused Plaintiffs' Certificates to have their credit ratings downgraded. At the time they were issued, all of the Certificates were given the highest credit rating—"AAA" by Standard and Poors ("S&P") or "Aaa" by Moody's Investor Services ("Moody's"). Today, all of the Certificates' ratings have been slashed to below investment-grade, or to "junk" status. Accordingly, the Certificates are no longer marketable at or near the prices Plaintiffs paid for them, and Plaintiffs have suffered significant losses.

16.     Plaintiffs seek compensatory and/or rescissory damages against Defendants for fraud and negligent misrepresentation, and statutory damages under the Securities Act, the California Corporate Securities Act, the California Civil Code, and common law.

{2481 / CMP / 00108800.DOC v1 }                    **COMPLAINT**

## II.   JURISDICTION AND VENUE

17.   With respect to claims under the Securities Act, this Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v. With respect to the remaining claims, the Court has original jurisdiction because the matter in controversy exceeds the sum or value of $25,000.

18.   The Court has personal jurisdiction over the Defendants pursuant to California Code of Civil Procedure § 410.10. Defendants Countrywide Financial and Countrywide Home Loans' principal place of business is in the State of California; many of the remaining Defendants have offices in California, and conduct and are registered to do business in California. In addition, the violations of law complained of herein occurred in California, including the preparation and dissemination of materially false and misleading statements in the Registration Statements and the Prospectus Supplements, and the offer and sale of the Certificates by Defendants to Plaintiffs in California.

19.   Venue is proper in this Court because the violations of law complained of herein occurred in this County, including the preparation and dissemination of materially false and misleading statements in the Registration Statements and the Prospectus Supplements. Furthermore, Defendants Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Home Loans Servicing and many of their affiliated entities, maintain their principal executive offices in this County, and each of the Countrywide Depositor Defendants (as defined herein) conducts business and/or is headquartered in this County.

## III.   PARTIES

### A.   Plaintiffs

20.   Plaintiffs Federated Ultrashort Bond Fund, Federated Fund for U.S. Government Securities, Federated Government Income Securities, Inc. and Federated Mortgage Core Portfolio are fixed income mutual funds that are managed by Federated Investment Management Company. Each of these funds invests in MBS and purchased the Certificates identified in Exhibit 1.

{2481 / CMP / 00108800.DOC v1}

21. Federated Investment Management Company is a subsidiary of Federated Investors Inc. which is a publicly-owned investment company, incorporated in Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

**B. Defendants**

22. Defendant Countrywide Financial was, at all relevant times, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.

23. As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

24. Defendant Countrywide Home Loans, Inc. ("Countrywide Home"), a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home originates and services residential home mortgage loans. Countrywide Home served as the "Seller" of the mortgage loans securing the Countrywide Certificates purchased by Plaintiffs, and played a central role in providing the pools of mortgage loans upon which the Certificates were based to the issuing trusts.

25. Countrywide Home was acquired by Bank of America on July 1, 2008, and is now doing business as Bank of America Home Loans, a division of Bank of America.

26. Defendant Countrywide Home Loans Servicing LP ("Countrywide Servicing") is a wholly owned subsidiary of Countrywide Capital Markets, LLC, ("Countrywide Capital Markets"), which is, in turn a wholly-owned subsidiary of Countrywide Financial. Countrywide Servicing is a limited partnership organized under the laws of Texas with offices in Plano, Texas and Calabasas, California. Countrywide Servicing services residential home mortgage loans. Countrywide Servicing was acquired by Bank of America on July 1, 2008, and is now doing business as BAC Home Loan Servicing, LP. Countrywide Servicing was the servicer of the Countrywide Certificates purchased by Plaintiffs.

{2481 / CMP / 00108800.DOC v1}     **COMPLAINT**

27.     Defendant Countrywide Capital Markets is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California. Countrywide Capital Markets (now a subsidiary of Bank of America) operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities and Countrywide Servicing Exchange.

28.     Defendant CWALT, Inc. ("CWALT") was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWALT was identified as the Depositor of the MBS with respect to one of the Registration Statements and Certificates identified in Exhibit 1. CWALT was, therefore, an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR § 230.191.

29.     Defendant CWMBS, Inc. ("CWMBS") was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWMBS's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWMBS was identified as the Depositor and an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR § 230.191, with respect to the Registration Statements and Certificates identified in Exhibit 1.

30.     CWALT and CWMBS are controlled directly by Countrywide Financial, including by the appointment of Countrywide Financial executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by CWALT and CWMBS and the Issuing Trusts were passed through to Countrywide and consolidated into Countrywide Financial's financial statements. Defendant Countrywide Financial, therefore, exercised actual day-to-day control over Defendants CWALT and CWMBS.

31.     CWALT and CWMBS are hereinafter referred to as the Countrywide Depositor Defendants.

32.     Each time the Countrywide Depositor Defendants publicly offered and sold MBS, they filed publicly-available prospectus supplements with the SEC. Plaintiffs purchased Certificates issued pursuant to six of those prospectus supplements, as set forth in Exhibit 1.

7

**COMPLAINT**

33.    Defendant Countrywide Securities Corporation ("Countrywide Securities"), a wholly owned subsidiary of Countrywide Financial, is a California corporation with its principal place of business in Calabasas, California.  Countrywide Securities is an SEC registered broker-dealer and acted as an underwriter, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), for the Certificates, and drafted and disseminated various Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs.

34.    Countrywide Securities was acquired by Bank of America on July 1, 2008.

35.    Defendant Bank of America is a holding company which, through its subsidiaries, engages in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.

36.    Bank of America Corp. is also a successor-in-interest to the Countrywide Defendants, as described in ¶¶ 234-240.  On July 1, 2008, Countrywide Financial completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide Financial.  The acquisition was an all-stock transaction.  Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by Countrywide.  At the time of Bank of America's purchase of Countrywide, a Bank of America spokesperson publicly stated: "We bought the company and all of its assets and liabilities . . . [w]e are aware of the claims and potential claims against the company and have factored these into the purchase."  As successor-in-interest, Bank of America is thus vicariously liable for the conduct of the Countrywide Defendants alleged herein.[1]

37.    Defendant BAC Home Loans Servicing, LP is a limited partnership and subsidiary of Bank of America with its principal offices at 4500 Park Granada, Calabasas, CA.  BAC Home

---

[1]  The federal court in the SEC Action against Mozilo and Sambol recently noted that "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using its Countrywide name in April 2009."  *Securities and Exchange Commission v. Mozilo*, No. 09-CV-3994, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

{2481 / CMP / 00108800.DOC v1}                    **COMPLAINT**

1  Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home

2  Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP," meaning it was formerly

3  known as Countrywide Home Loans Servicing, LP, the Countrywide subsidiary responsible for

4  servicing Countrywide's mortgage loans after they are originated.

5       38.    Defendant NB Holdings Corporation is a Delaware corporation. NB Holdings

6  Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger,

7  and is a successor to Defendant Countrywide Home Loans. On July 3, 2008, Defendant

8  Countrywide Home completed the sale of substantially all of its assets to NB Holdings Corporation,

9  a wholly-owned subsidiary of Bank of America.

10       39.    Defendant Banc of America Mortgage Securities Inc. ("Banc of America Mortgage

11  Securities"), at all times relevant to this complaint, was a direct wholly owned subsidiary of Bank

12  of America, National Association ("Bank of America, N.A.") and was incorporated in the State of

13  Delaware. Bank of America, N.A. is an indirect wholly owned subsidiary of Bank of America

14  Corp. Banc of America Mortgage Securities, Inc.'s principal offices are located at 214 North Tryon

15  Street, Charlotte, North Carolina 28255. Banc of America Mortgage Securities, Inc. acted as

16  Depositor and loan underwriter for one of the Registration Statements and Certificates identified in

17  Exhibit 1. Each time Banc of America Mortgage Securities publicly offered and sold MBS, it filed

18  publicly-available prospectus supplements with the SEC. Plaintiffs purchased Certificates issued

19  pursuant to one of these Prospectus Supplements.

20       40.    Banc of America Securities LLC ("BOAS") is an SEC registered broker-dealer,

21  principally located at One Bryant Park, New York, New York 10036. BOAS acted as an

22  underwriter, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), for the Certificates

23  identified in Exhibit 1, and drafted and disseminated various Prospectus Supplements pursuant to

24  which the Certificates were sold to Plaintiffs.

25       41.    Defendant UBS Securities LLC ("UBS") is an SEC registered broker-dealer,

26  principally located at 1285 Avenue of the Americas, 19th Floor, New York, New York 10019. UBS

27  acted as an underwriter, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), for the

28  Certificates identified in Exhibit 1, and drafted and disseminated various Prospectus Supplements

9

1 │ pursuant to which certain Certificates were sold to Plaintiffs.  BOAS also acted as the broker with

2 │ respect to Plaintiffs' purchases of certain Countrywide and Bank of America MBS.

3 │      42.     Lehman Brothers Inc. ("Lehman Brothers") is an SEC registered broker-dealer,

4 │ principally located at 745 Seventh Avenue, New York, New York 10019.  Lehman Brothers acted

5 │ as an underwriter, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), for certain

6 │ Certificates identified in Exhibit 1, and drafted and disseminated various Prospectus Supplements

7 │ pursuant to which the Certificates were sold to Plaintiffs.

8 │      43.     Morgan Stanley is an SEC registered broker-dealer, principally located at 1585

9 │ Broadway, New York, New York 10036.  Morgan Stanley acted as an underwriter, within the

10 │ meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), for certain Certificates identified in Exhibit

11 │ 1, and drafted and disseminated various Prospectus Supplements pursuant to which certain

12 │ Certificates were sold to Plaintiffs.

13 │      44.     Defendant RBS is as a successor to Greenwich Capital Bank which was an

14 │ underwriter for CWHL 2005-17.  Greenwich Capital Markets was acquired by National

15 │ Westminster Bank in June of 1996, and then National Westminster Bank was acquired by the Royal

16 │ Bank of Scotland in March 2000.  RBS is an SEC registered broker-dealer, principally located at

17 │ 600 Steamboat Road, Greenwich, Connecticut 06830.  RBS acted as an underwriter, within the

18 │ meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), for certain Certificates identified in Exhibit

19 │ 1, and drafted and disseminated various Prospectus Supplements pursuant to which the Certificates

20 │ were sold to Plaintiffs.

21 │      45.     Defendants Countrywide Securities Corp., UBS Securities LLC, Lehman Brothers,

22 │ BOAS, Morgan Stanley and RBS are collectively referred to as the "Underwriter Defendants."

23 │      46.     Defendant Angelo R. Mozilo ("Mozilo"), Countrywide's co-founder, was Chairman

24 │ of Countrywide Financial's Board of Directors starting in March 1999 and Chief Executive Officer

25 │ ("CEO") starting in February 1998.  He was also President of Countrywide Financial from March

26 │ 2000 through December 2003.  Mozilo was a member of Countrywide Financial's Board beginning

27 │ in 1969, when the Company was founded, and served in other executive roles since then.  He left

28 │

{2481 / CMP / 00108800.DOC v1}

1   Countrywide on July 1, 2008. At all relevant times, Mozilo directed, authorized, and participated in

2   the Countrywide Defendants' wrongdoing, as alleged herein.

3          47.     In October 2010, Mozilo settled securities fraud claims brought against him by the

4   SEC for $67.5 million in penalties and forfeiture of ill-gotten gains, the largest penalty ever paid by

5   a senior corporate executive in an SEC settlement.

6          48.     Defendant David Sambol ("Sambol") joined Countrywide Financial in 1985 and was

7   Countrywide Financial's President and Chief Operating Officer ("COO") from September 2006

8   until Countrywide Financial was acquired by Bank of America in 2008. Sambol was Countrywide

9   Financial's executive managing director for business segment operations and Chief Production

10  Officer from April 2006 until September 2006, and executive managing director and chief of

11  mortgage banking and capital markets from January 2004 until April 2006. Sambol was also

12  Chairman, CEO and a member of the Board of Directors of Countrywide Home beginning in 2007.

13  At all relevant times, Sambol directed, authorized, and participated in the Countrywide Defendants'

14  wrongdoing, as alleged herein. In October 2010, Sambol settled securities fraud claims brought

15  against him by the SEC.

16         49.     Defendant Stanford L. Kurland ("Kurland") was, at relevant times, the Chief

17  Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWALT, and

18  CWMBS. Defendant Kurland signed CWALT's File No. 333-12509 (issued on July 25, 2005) and

19  CWMBS's File No.333-125963 (issued on July 25, 2005). Defendant Kurland was concurrently

20  the Executive Vice President and Chief Operating Officer ("COO") of Defendant Countrywide

21  Financial.

22         50.     Defendant David A. Spector ("Spector") was, at relevant times, Vice President and a

23  member of the Board of Directors for CWALT and CWMBS. Defendant Spector signed CWALT's

24  File No. 333-12509 (issued on July 25, 2005) and CWMBS's File No. 333-125963 (issued on July

25  25, 2005). Defendant Spector was concurrently the Senior Managing Director of Secondary

26  Marketing of Defendant Countrywide Financial.

27         51.     Defendant Eric P. Sieracki ("Sieracki") was, at relevant times, the Executive Vice

28  President, CFO, Treasurer and member of the Board of Directors for CWALT and CWMBS.

11

1    Defendant Sieracki signed CWALT's File No. 333-12509 (issued on July 25, 2005) and CWMBS's
2    File No. 333-125963 (issued on July 25, 2005). Defendant Sieracki was concurrently the Executive
3    Vice President and CFO of Defendant Countrywide Financial.

4         52.    Defendant N. Joshua Adler ("Adler") was, at relevant times, President, CEO and a
5    member of the Board of Directors for CWALT and CWMBS. Defendant Adler signed CWMBS's
6    File No. 333-140958 (issued on April 24, 2007).

7         53.    Defendant Ranjit Kripalani ("Kripalani") was, at relevant times, a member of the
8    Board of Directors for CWALT and CWMBS. Defendant Kripalani signed CWMBS's File No.
9    333-140958 (issued on April 24, 2007).

10        54.    Defendant Jennifer S. Sandefur ("Sandefur") was, at relevant times, a member of the
11   Board of Directors for CWALT and CWMBS. Defendant Sandefur signed CWMBS's File No.
12   333-140958 (issued on April 24, 2007). Defendant Sandefur was concurrently the Senior
13   Managing Director and Treasurer of Countrywide Home.

14        55.    Defendants Mozilo, Kurland, Spector, Sieracki, Adler, Kripalani and Sandefur are
15   collectively referred to herein as the "CW Signatory Defendants."

16        56.    Defendants Kurland, Spector, Sieracki, Adler, Kripalani and Sandefur, Mozilo and
17   Sambol are collectively referred to hereinafter as the "Individual Defendants."

18        57.    Defendants Countrywide Financial, Countrywide Capital Markets, Countrywide
19   Home Loans, Countrywide Servicing, Countrywide Securities, CWALT, CWMBS and the
20   Individual Defendants are hereinafter collectively referred to as the "Countrywide Defendants."

21   IV.    BACKGROUND

22        A.    The Securitization Process

23        58.    A mortgage securitization is where mortgage loans are acquired, pooled together,
24   and then sold to investors, who acquire rights in the income flowing from the mortgage pools.
25   When borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed
26   through" to investors in order of priority based on the specific tranche held by the mortgage-backed
27   security investor. The highest tranche (also referred to as the senior tranche) is first to receive its
28

{2481 / CMP / 00108800.DOC v1}    **COMPLAINT**

1 | share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers

2 | become delinquent or default on their mortgage.

3 |      59.    The securitization of residential mortgage loans, and the creation of residential

4 | mortgage backed securities collateralized against these loans, typically follows the same structure

5 | and pattern in every transaction.  First a loan originator, such as a mortgage lender or bank,

6 | originates the underlying residential mortgage loan.  After a loan has been made, a "sponsor" or

7 | "seller" (who either originated the loans itself or acquired the loans from other loan originators)

8 | sells the mortgage loans to a "depositor."  The depositor pools these loans and deposits them into a

9 | special purpose entity or trust created by the depositor.  In order to facilitate multiple offerings of

10 | MBS, a depositor sets up multiple trusts to hold the different pools of mortgages that are to be

11 | securitized.  One trust is established to hold the pool of mortgages for each offering.  In the case of

12 | each offering, in return for the pool of mortgages acquired from the depositor, the trust issues and

13 | distributes MBS Certificates to the depositor.  The depositor then works with an underwriter to

14 | price and sell the Certificates to investors.  Thereafter, a servicer is appointed to service the

15 | mortgage loans held by the trust, *i.e.*, to collect the mortgage payments from the borrower in the

16 | form of principal and interest, and to remit them to the trust for administration and distribution to

17 | the MBS investors.

18 |     60.    In selling the Certificates to investors, the depositors and underwriters disseminate to

19 | investors various disclosure or Offering Documents describing the Certificates being sold.  The

20 | Offering Documents include: (a) a "shelf" registration statement (under SEC Rule 415, an issuer

21 | may file one registration statement covering several offerings of securities made during a period of

22 | up to three years after the filing of the registration statement); (b) a "base" prospectus; and (c) a

23 | "prospectus supplement."  Because a depositor will create multiple trusts to hold different pools of

24 | mortgages for multiple offerings of MBS (as described above), the depositor files one shelf

25 | registration statement and one base prospectus that apply to multiple trusts that the depositor

26 | proposes to establish.  With respect to each specific trust, however, the depositor also files a

27 | prospectus supplement that applies only to that particular trust.  Thus, for any given offering of

28 |

{2481 / CMP / 00108800.DOC v1}

1   securities, the relevant Offering Documents will typically be a shared registration statement and

2   shared base prospectus, as well as an individual, trust-specific prospectus supplement.

3       61.    Each investor who purchases a MBS certificate is entitled to receive monthly

4   payments of principal and interest from the trust. The order of priority of payment to each investor,

5   the interest rate to be paid to each investor, and other payment rights accorded to each investor,

6   including the speed of principal repayment, depend on which class or tranche of Certificates the

7   investor purchases.

8       62.    The highest or senior tranche is the first to receive its share of the mortgage

9   payments and is also the last to absorb any losses should mortgage borrowers become delinquent or

10  default on their mortgages. Accordingly, these senior tranches receive the highest investment rating

11  by the rating agencies, usually AAA. After the senior tranche, the middle tranches next receive

12  their share of the proceeds. The process of distributing the mortgage proceeds continues down the

13  tranches through to the bottom tranches, referred to as equity tranches.

14      63.    Investors can receive the payments owed to them only so long as the mortgage

15  borrowers are current on their mortgages. The value of an MBS, therefore, depends primarily on

16  the underlying mortgage borrowers' ability to make principal and interest payments and,

17  secondarily, on the adequacy of the collateral in the event of default. If the loans underlying a

18  certificate suffer defaults and delinquencies in excess of the assumptions built into the payment

19  structure, or the underlying properties cannot be sold at sufficient value following default, investors

20  suffer greater than expected losses.

21      64.    The securitization of loans fundamentally shifts the risk of loss from the mortgage

22  loan originators, such as Countrywide Home and Banc of America Mortgage Securities, to the

23  investor who purchased an interest in the securitized pool of loans. When the originator holds the

24  mortgage through the term of the loan, it profits from the borrower's payment of interest and

25  repayment of principal, but it also bears the risk of loss if the borrower defaults and the property

26  value is not sufficient to repay the loan. As a result, traditionally, the originator was economically

27  vested in establishing the creditworthiness of the borrower and the true value of the underlying

28  property through appraisal before issuing the mortgage loans. In securitizations where the

{2481 / CMP / 00108800.DOC v1}                    **COMPLAINT**

1    originator immediately sells the loan to an investment bank, it does not have the same economic

2    interests in establishing borrower creditworthiness or a fair appraisal value of the property in the

3    loan origination process.

4    **V.    SUBSTANTIVE ALLEGATIONS**

5        **A.    Plaintiffs' Investment in the Certificates**

6        65.    Plaintiffs purchased seven Certificates from the Defendants. Six were Countrywide

7    Certificates and one was a BAC Certificate, as set forth in the table below:

8

9

| Certificate | Purchase Date | Purchase Face | Purchase Price | Rating |
|---|---|---|---|---|
| CWALT 2005-51 3AB3 | 9/28/05 | $1,000,000 | 99.730000 | AAA* |
| CWHL 2005-21 A2 | 9/28/07 | $7,552,705 | 97.078125 | Aaa** |
| CWHL 2006-OA5 2A3 | 3/3/06 | $2,000,000 | 100.060000 | AAA |
| CWHL 2007-14 A18 | 8/13/07 | $23,937,550 | 97.770000 | AAA |
| CWHL 2007-17 3A1 | 8/8/07 | $48,600,000 | 100.450000 | AAA |
| CWHL 2007-18 2A1 | 8/23/07 | $32,800,000 | 99.984375 | AAA |
| BOAMS 2007-3 1A1 | 8/9/07 | $35,842,849 | 97.930000 | AAA |

* Standard & Poor's.    ** Moody's.

16

17        66.    The chart in Exhibit 1 identifies: (a) each Certificate Offering and tranche in which

18   Plaintiffs purchased; (b) the date of the Registration Statement was filed and the filing number;

19   (c) the signatories on the Registration Statements; (d) the date of the Prospectus; (e) the name of the

20   Issuer; (f) the Underwriters of the Securities; and (g) the loan underwriters. Countrywide Home

21   Loans was the Seller/Sponsor and servicer for each of the Countrywide Offerings and Bank of

22   America, NA was the sponsor and servicer of the Bank of America Offering.

23        67.    In the case of the Countrywide Certificates, the transactions among the

24   originator/sponsor/seller, depositor, trusts and underwriters were not arms-length transactions as

25   Countrywide Financial controlled nearly all the entities. The Countrywide Depositors, CWALT

26   and CWMBS, were created by Countrywide Financial, as "limited purpose finance entities" solely

27   for the purpose of facilitating the issuance of the Certificates. Countrywide Securities Corporation,

28

{2481 / CMP / 00108800.DOC v1}    **COMPLAINT**

1  Countrywide's underwriting division, along with RBS, UBS, Morgan Stanley, BOAS and Lehman

2  Brothers marketed and sold one or more of the Certificates.

3      68.    The Countrywide Depositor Defendants began the securitization process with the

4  acquisition of an inventory of loans from the seller, Defendant Countrywide Home Loans, which

5  either originated all of the underlying loans or combined loans it originated with loans acquired

6  from other mortgage originators.

7      69.    The Countrywide Depositor Defendants then transferred, or deposited, the acquired

8  pool of loans to an "issuing trust." The Depositor Defendants securitized the pool of loans in the

9  issuing trust so that the rights to the cash flows from the loans could be sold to investors.

10      70.    The trusts established by the Countrywide Depositor Defendants were:

11        • Alternative Loan Trust 2005-51

12        • CHL Mortgage Pass-Through Trust 2005-21

13        • CHL Mortgage Pass-Through Trust 2006-OA5

14        • CHL Mortgage Pass-Through Trust 2007-14

15        • CHL Mortgage Pass-Through Trust 2007-17

16        • CHL Mortgage Pass-Through Trust 2007-18

17      71.    Countrywide then worked closely with the rating agencies to structure the

18  securitizations to ensure that each tranche of MBS received the highest rating. Once the tranches

19  were established, the issuing trusts passed the securities back to the Depositor Defendants, who

20  became the issuers of the Certificates.

21      72.    The Depositor Defendants next passed the Certificates to the underwriters,

22  Countrywide Securities, RBS, UBS, Morgan Stanley, BOAS and Lehman Brothers, who in turn

23  offered the Certificates to Plaintiffs and other investors. Following the sale of the Certificates,

24  Countrywide Home Loan Servicing LP was responsible for the collection of borrower payments,

25  and the trustee participates in the subsequent distribution of those payments to investors at regular

26  intervals in accordance with the offering's structure.

27      73.    The creation and sale of Bank of America Certificates, BOAMS 2007-3, followed

28  largely the same pattern as the Countrywide MBS process. The transactions among the originator,

{2481 / CMP / 00108800 DOC v1}    **COMPLAINT**

1  sponsor, seller, depositor, trusts, and underwriter were not at arm's-length. Each of these entities

2  was a direct or indirect subsidiary of, and controlled by, Bank of America.

3      74.    Banc of America Mortgage Securities originated the mortgage loans. It also served

4  as Depositor, acquiring the loans from its parent, Bank of America, N.A., which served as the

5  Sponsor. Banc of America Mortgage Securities then transferred, or deposited, the acquired pool of

6  loans to an "issuing trust." The name of the trust for this particular transaction was Banc of

7  America Mortgage 2007-3 Trust. Banc of America Mortgage Securities next securitized the pool of

8  loans in the issuing trust so that the rights to the cash flows from the loans could be sold to

9  investors. Banc of America Mortgage Securities then passed the certificate to the underwriter,

10  BOAS, who underwrote and sold the Certificate to Plaintiffs and other investors. Following the

11  sale of the Certificate, Bank of America, N.A. was the Servicer.

12      75.    BOAS also served as the Plaintiffs' broker for the following three Certificates:

13  CWHL 2005-21; CWHL 2007-14 and BOAMS 2007-3.

14      76.    In connection with their roles as depositors, Defendants CWALT, CWMBS and

15  Banc of America Mortgage Securities prepared and filed with the SEC numerous shelf registration

16  statements. For purposes of this action, the Certificates purchased by Plaintiffs are traceable to the

17  following Registration Statements prepared and filed by Defendants CWALT, CWMBS and Banc

18  of America Mortgage Securities:

19  **CWALT**

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-125902 | July 25, 2005 | $45,335,287,290 |

22  **CWMBS**

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-125963 | July 25, 2005 | $40,742,304,251 |
| 333-140958 | April 24, 2007 | $144,647,113,029 |

26  **Banc of America Mortgage Securities**

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-132249 | May 12, 2006 | $31,600,000,000 |

17

77.     By preparing the above Registration Statements, each of Defendants CWALT, CWMBS and Banc of America Mortgage Securities was an "issuer" within the meaning of the Securities Act, 15 U.S.C. § 77(b)(a)(4), of the Certificates traceable to the above Registration Statements.

78.     The Certificates for all offerings were issued pursuant to the Offering Documents. These documents generally explained the structure and provided an overview of the Certificates. CWALT, CWMBS, Banc of America Mortgage Securities and the Underwriter Defendants prepared the Offering Documents for one or more offerings, together with other Countrywide and/or Bank of America Defendants. The Signatory Defendants signed one or more Registration Statements, as set forth in Exhibit 1.

**B.     Important Factors in Plaintiffs' Decision to Invest in the Certificates**

79.     Plaintiffs decided to purchase each Certificate on the basis of (i) representations in the applicable Offering Documents filed with the SEC, and (ii) other information provided to Plaintiffs' investment managers by Defendants. In connection with the offers and sales of the Certificates to Plaintiffs, the Countrywide and Bank of America Underwriters provided directly or indirectly to Plaintiffs the Offering Documents and additional documents, such as statistical tables to be included in the Prospectus Supplements. These documents included term sheets, pooling and servicing agreements, computational material, data regarding the loan-to-value ("LTV") and debt-to-income ratios of the pools, and computer models of the financial structures of the securitizations. Similar information was sent to and analyzed by Plaintiffs if the Certificate was sold to it in the secondary market.

80.     Plaintiffs reviewed and analyzed the information provided with respect to each offering of Certificates and performed various analyses of the Certificate-specific data for each offering before deciding to purchase Certificates in the offering. The analyses conducted by Plaintiffs before deciding to purchase a Certificate included various credit analyses based on the information provided by Countrywide Securities with respect to both the credit characteristics of the mortgage loan pool (including, for example, geographic concentration; weighted average life; fixed- or floating-rate loans; full-, low-, or no-documentation "stated income" loans; and owner-

18

**COMPLAINT**

occupied, second home, or investment properties), and the structure of the securitization with respect to the seniority and risk characteristics of the particular tranche of Certificates (including, for example, position in the payment "waterfall") and the amount of overcollateralization.

81.     Plaintiffs relied on the information in the term sheets, computational material, and other data in these documents, as well as the Offering Documents' representations about the underwriting guidelines that were purportedly followed in originating the mortgage loans for Countrywide's Certificates.

82.     As investors such as Plaintiffs do not have access to and cannot obtain information relating to the nature and quality of the loans in a particular trust, they rely heavily on the underwriting guidelines in making their decision to invest in the Certificates.

83.     These documents contained numerous statements of material facts about the Certificates (described in detail below in Section VII), including statements concerning: (a) underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Certificates; (b) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (c) the LTV ratios, debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (d) the underwriting practices; (e) the credit ratings and (f) various forms of credit enhancement applicable to certain tranches of Certificates.

84.     Sound underwriting was critically important to Plaintiffs because the ability of Countrywide and Bank of America borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificates were valued. Independent and accurate appraisals were also critically important to investors such as Plaintiffs because they ensured that the mortgage loans underlying the Certificates were not under-collateralized, thereby protecting MBS investors in the event a borrower defaulted on a loan. As such, by allowing MBS investors to assess the degree to which a mortgage loan was adequately collateralized, accurate appraisals provided investors such as Plaintiffs with a basis for assessing the price and risk of the Certificates.

85.     One measure that uses the appraisal value to assess whether the mortgage loans are under-collateralized is the loan-to-value ratio (the "LTV ratio"). The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total value of the property, as obtained from the appraisal. For example, if a borrower seeks to borrow $900,000 to purchase a house worth $1,000,000, the LTV ratio is $900,000/$1,000,000 or 90%. If, however, the appraised value of the house is artificially raised to $1,200,000, the LTV ratio drops to just 75%.

86.     From a lender's perspective the higher the LTV ratio, the riskier the loan, because it indicates the borrower has a lower equity stake, and a borrower with a lower equity stake in a property has less to lose if he defaults on the loan. A high LTV ratio also creates a heightened risk that, should the borrower default, the amount of outstanding loan may exceed the value of the property in a subsequent sale.

87.     However, as discussed in detail below, the statements of material facts relating to underwriting standards, LTV ratios, and appraisals contained in the Offering Documents were untrue because: (a) Countrywide Home Loans and Banc of America Mortgage Securities violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (b) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue; and (c) the actual numbers of riskier "second home" and "investment property" mortgagees were higher than the stated numbers. In addition, metrics such as debt-to-income ratios were untrue as a result of Countrywide and Bank of Americas' acceptance of untrue information from mortgage applicants.

C.     **Countrywide Misrepresents its Mortgage Loan Underwriting Guidelines**

88.     While the vast majority of the loans underwritten and originated by Countrywide were resold to investors in the secondary market, through either whole loan sales or MBS securitization, it was becoming increasingly difficult for Countrywide to meet the market demand for MBS using its stated underwriting guidelines. In order to originate more loans, Countrywide created and approved riskier loan products not only by implementing looser underwriting guidelines, but by applying numerous exceptions to its already weakened standards.

20

**COMPLAINT**



89.     In July 2003, during a conference call with analysts, Mozilo announced that Countrywide's new goal was "to dominate the purchase market and to get [Countrywide's] overall market share to the ultimate thirty percent by 2006-2007." Starting no later than 2004, Countrywide began offering a broader array of products in an attempt to effectuate this goal and retain its title as top mortgage lender. Countrywide Home originated over $499 billion in mortgage loans in 2005, $468 billion in 2006, and $416 billion in 2007. Countrywide recognized pre-tax earnings of $2.4 billion and $2.0 billion in its loan production divisions in 2005 and 2006, respectively.

90.     Despite taking on new risks to participate in the non-GSE mortgage-backed securities market, Countrywide continued to tout its underwriting standards, representing that it was a successful, trustworthy company characterized by high professional standards. Countrywide's Annual Reports for 2005, 2006, and 2007 stated that the company "establishe[d] standards for the determination of acceptable credit risks" and that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." The Annual Reports also promoted Countrywide's "proprietary underwriting systems that improve the consistency of underwriting standards, assess collateral adequacy and help prevent fraud." In its 2005 10-K, for example, which was filed in March 2006, Countrywide stated that "[w]e ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages . . . We are focused on ensuring the quality of our mortgage loan production."

91.     Countrywide claimed that its disciplined underwriting standards not only distinguished it from other lenders in the industry, but reflected enviable best practices. For example, in a Fixed Income Investor Forum hosted by Countrywide in September 2006, Mozilo explained that Countrywide led the industry in responsible lending: "[A]s an industry leader we serve as a role model to others in terms of responsible lending. We take seriously the role of a responsible lender for all of our constituencies. . . . To help protect our bond holder customers, we engage in prudent underwriting guidelines."

92.     Because its loan-origination guidelines were ostensibly designed to ensure that loans would perform over time, Countrywide knew that the rigorousness of its guidelines—and its

21

1  adherence to those guidelines—would materially affect the risk of investing in the Certificates.

2  Throughout Countrywide's expansion, Defendant Mozilo consistently represented that

3  Countrywide would not sacrifice its strict and disciplined underwriting standards.  In a January

4  2004 call with analysts, Mozilo pledged that Countrywide's goal of achieving 30% market share

5  would not compromise the Company's strict underwriting standards, stating that Countrywide

6  would target the safest borrowers in the market in order to maintain its commitment to quality.

7  "Going for 30% mortgage share here is totally unrelated to quality of loans we go after . . . . There

8  will be no compromise in that as we grow market share.  Nor is there a necessity to do that."

9       93.     Countrywide reassured investors that the Company's underwriting procedures and

10  credit risk management remained highly rigorous in the following years.  For example, in its 2005

11  10-K, filed with the SEC on February 28, 2006, and thereafter, Countrywide represented that:

12  [Countrywide] ensure[s] . . . ongoing access to the secondary mortgage market by consistently

13  producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary

14  mortgage market standards . . . .  [W]e have a major focus on ensuring the quality of our mortgage

15  loan production and we make significant investments in personnel and technology in this regard.

16       94.     During a March 15, 2005 conference call with analysts, Mozilo responded to a

17  question about Countrywide's strategy dating back to 2003, for increasing market share by assuring

18  Countrywide's constituents: "Your question is 30 percent, is that realistic, the 30 percent [market

19  share] goal that we set for ourselves in 2008?  . . . Is it achievable?  Absolutely . . . . But I will say

20  this to you, that under no circumstances will Countrywide ever sacrifice sound lending and margins

21  for the sake of getting to that 30 percent market share."

22       95.     Other senior Countrywide officers reiterated that the Company had not strayed from

23  its underwriting standards, and would not do so in the future.  For example, in an April 2005

24  conference call with analysts, Defendant Sieracki, Countrywide's CFO, responded to a question

25  about whether Countrywide had changed its underwriting protocols: "I think [Fair Isaac

26  Corporation ("FICO") credit scores, combined loan-to-value ratios, and debt-to-income ratios] will

27  remain . . . consistent with the first quarter and most of what we did in 2004.  We don't see any

28  change in our protocol relative to the volume [of] loans that we're originating."

22

1      96.    Similarly, the Offering Documents themselves contained many affirmative

2 representations concerning Countrywide's underwriting guidelines, all of which were intended to

3 induce Plaintiffs and other investors to invest in the Certificates. For example, Countrywide

4 represented that all or a portion of the underlying loans were "originated or acquired in accordance

5 with Countrywide's underwriting standards," noting only that "exceptions to Countrywide Home

6 Loans' underwriting guidelines may be made if compensating factors are demonstrated by a

7 prospective borrower." Countrywide also assured investors that the selection of the underlying

8 loans "was not made in a manner intended to affect the interests of the certificate holders

9 adversely."

10      97.    As explained herein, at the time the Certificates were offered between 2005 through

11 2007, Countrywide knew, or recklessly disregarded, that its statements regarding its underwriting

12 guidelines and credit risk management processes were false, and that it had no intention of abiding

13 by its representations and warranties to investors. Under the direction of Mozilo and Sambol,

14 Countrywide adopted a new corporate culture of writing as many mortgage loans as possible—and

15 at the highest interest rates and fees possible—regardless of the creditworthiness or evident fraud of

16 the borrower. Once Mozilo and Sambol had determined that profit growth through securitization

17 required accelerating loan origination, Countrywide motivated its loan officers and external brokers

18 to drive up loan volume regardless of material deviations from stated underwriting guidelines.

19 Countrywide's deteriorating underwriting practices enabled loan applications that reflected

20 borrower fraud, inadequate documentation, missing verifications (for example, of borrower assets

21 and income), title defects, excessive debt to income ratios, inadequate FICO scores, and other

22 material violations of guidelines. These violations made Countrywide's related representations

23 regarding its adherence to stated underwriting guidelines materially false and misleading because,

24 in reality, Countrywide undertook an undisclosed and unprecedented loosening of its underwriting

25 guidelines such that the exceptions became the standard.

26

27

28

**COMPLAINT**

{2481 / CMP / 00108800.DOC v1}



**D. Countrywide Knowingly Abandoned Its Underwriting Guidelines by Approving Extremely Risky Loans through "Shadow Guidelines" and Other Undisclosed Exceptions**

98. Instead of following the conservative underwriting guidelines outlined in the Offering Documents for each certificate, Countrywide began to originate an increasing number of poor-quality loans that did not comply with its stated underwriting guidelines. Countrywide entered into a deliberate and calculated scheme of originating large numbers of mortgage loans, regardless of a borrower's ability to pay, and then quickly flipping these loans at a profit on the secondary market. Under this scheme Countrywide intentionally and aggressively marketed loans to borrowers with poor credit histories and who were thus at heightened risk of default. Countrywide originated such mortgage loans although they did not comply with its internal underwriting guidelines.

99. While Countrywide disclosed generally that the underlying loan pool for each Certificate could contain loans originated pursuant to "exceptions" to the Company's stated underwriting guidelines if "compensating factors" existed, Countrywide failed to disclose what percentage of (or in many cases, whether any) securitized loans were actually approved pursuant to exceptions. Nor did it define the types of exceptions that Countrywide employed generally in the loan pool, or specifically for each loan. In fact, as confirmed by several senior executives at Countrywide, including executives directly involved in loan securitizations, Countrywide never disclosed in its Offering Documents or in any other public filings the amount of loans it was underwriting on an exceptions basis for any loan product or division. For example, Paul Liu, an attorney who worked for Countrywide and participated in the preparation of the Offering Documents, testified in the SEC Action that the Prospectus Supplements did not disclose the number or percentage of loans included in each securitization that were underwritten pursuant to exceptions, or even in many cases whether any loans within that securitization were underwritten pursuant to exceptions—just that exceptions "may be made."

100. According to Countrywide's Chief Risk Officer, John McMurray, Countrywide's level of exceptions was higher than other mortgage lenders. At a June 28, 2005 Credit Risk

24

1   Committee meeting, senior executives including CFO Sieracki and McMurray received a
2   presentation informing the attendees that nonconforming exceptions loans accounted for a
3   staggering 40% of Countrywide's loan originations.  By June 2006, a Credit Risk Leadership
4   package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option
5   ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, and 55.3% of its
6   stand-alone home equity loans.  Despite this high level of exceptions, Countrywide advised
7   investors that the level of exceptions was low.  According to Christopher Brendler, an analyst for
8   Stifel Nicholas who covered Countrywide beginning in January 2006 and was deposed in the SEC
9   Action, Countrywide repeatedly told investors during conference calls and at investor forums that
10  the company's policy was to "keep our exceptions low."  Brendler also testified that a low
11  exception rate for the industry would have been 5% to 10% of total loans, and most certainly not
12  upwards of 25% to 55%, such as Countrywide actually had.

13       101.   Subsequent press reports and articles highlight the excessive focus on lending
14  volume and failure to follow stated underwriting standards that existed throughout Countrywide
15  during the relevant period. For example, in February 2009, in an article entitled "25 People to
16  Blame for the Financial Crisis," *Time* magazine described how Mozilo's and Countrywide's focus
17  on loan volume and the practice of offering mortgages to "practically any adult" ignored a
18  borrower's "questionable ability to repay" those mortgage loans.  Thus, Countrywide steered
19  borrowers to loans with higher interest rates and the most fees, resulting in greater delinquencies.

20       102.   Lawsuits filed by insurers of some of Countrywide's mortgage loans have confirmed
21  Countrywide's deviation from its stated underwriting practices, and material deficiencies prevalent
22  in the loans underwritten pursuant to these deviations.  On September 30, 2008, MBIA filed a
23  complaint against Countrywide in New York state court, entitled *MBIA Insurance Corp. v.*
24  *Countrywide, et al.*, No. 08/602825 (N.Y. Sup.).  The MBIA complaint alleges that Countrywide
25  fraudulently induced MBIA to provide insurance for certain Certificates.  Through an investigation
26  of approximately 19,000 loan files, MBIA discovered that there was "an extraordinarily high
27  incidence of material deviations from the underwriting guidelines Countrywide represented it
28  would follow."  MBIA discovered that many of the loan applications "lack[ed] key documentation,

{2481 / CMP / 00108800.DOC v1}

1  such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal;

2  demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of

3  borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated

4  Countrywide guidelines (without any permissible exception)." Significantly, "MBIA's re-

5  underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the

6  Countrywide Securitizations show material discrepancies." MBIA's common law fraud claims

7  against Countrywide were substantially upheld by the court and sustained on appeal. *See MBIA*

8  *Insurance Corporation v. Countrywide Home Loans, Inc.*, 2009 WL 2135167 (N.Y. Sup. July 8,

9  2009), *aff'd in relevant part, MBIA Insurance Corporation v. Countrywide Home Loans, Inc.*, 2011

10  WL 2567772 (N.Y.A.D. 1 Dept. June 30, 2011).

11         103.   Other complaints filed by bond insurers also reveal shocking fraud by Countrywide

12  loan officers. *See Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, Index No.

13  641612/2010 (N.Y. Sup. May 6, 2010), *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*,

14  Index No. 650042/09E (N.Y. Sup.) (filed on May 6, 2010 after the initial Complaint was largely

15  sustained on March 31, 2010); and *Mortgage Guaranty Insurance Corporation* (arbitration).

16         104.   Two of Countrywide's widely used exceptions to its represented underwriting

17  guidelines were the focus of the SEC Action, and exemplify the extreme undisclosed risks posed by

18  such practices. First, from the beginning of 2005, it was Countrywide's policy to "match" any

19  product offered by any of its competitors, regardless of risk, making its composite "matching"

20  guidelines, internally referred to as "shadow guidelines," the "most aggressive in the industry."

21  Second, knowing that it could unload the risk of borrower default by selling and securitizing the

22  riskiest loans, Countrywide instituted a policy to accept any loan—regardless of the risk level or

23  likelihood of default—as long as the loan could be resold for securitization. These policies directly

24  and adversely affected the interests of Plaintiffs and other investors in the Certificates.

25

26

27

28

{2481 / CMP / 00108800.DOC v1}                    **COMPLAINT**

**1.** **Countrywide's Undisclosed "Matching" Strategy Ensured**

**That Countrywide's Underwriting Guidelines were**

**the "Most Aggressive" Guidelines in the Market**

105. When processing loan applications, Countrywide first applied its standard underwriting guidelines to all applications using an automated underwriting system known as "CLUES" (Countrywide Loan Underwriting Expert System). To the public and the participants in the securitizations, including Plaintiffs, Countrywide extolled the integrity and consistency of its automated CLUES system. Countrywide falsely claimed that it made exceptions to CLUES only when specific and strong compensating factors were present. In fact, there were three levels of exceptions, with a threshold for risk that surpassed that of any of Countrywide's competitors.

106. First, if CLUES found problems with an application because it failed to meet one of the standard criteria, the application was sent to a loan officer for further consideration or manual underwriting in the "Exception Processing System" "because it busted one or more of the program guidelines or because of these red flags," according to Chief Risk Officer McMurray.

107. If the loan officer could not rectify the problems and approve the loan in accordance with Countrywide's stated underwriting guidelines or some limited exceptions, the loan officer did not reject the application. Rather, he or she would request an "exception" from the guidelines from more senior underwriters at Countrywide's loan production structured lending desks ("Production SLD"), otherwise known as "the exception desk."

108. The Production SLD Desk, the second level of exception review, granted exceptions, in large part, pursuant to Countrywide's "matching strategy." From at least the beginning of 2005, Countrywide implemented a program which allowed loan officers to "match" the most aggressive product or policy of any loan origination competitor, including purely subprime lenders such as New Century and First Franklin, even if that product or policy violated Countrywide's stated underwriting guidelines. Countrywide's liberal use of any competitor's "composite guideline" made the Company's loan origination practices "the most aggressive in the industry" according to Countrywide's own Chief Risk Officer, John McMurray. Countrywide's matching strategy was not limited to one single loan product, or limited to subprime loans.

{2481 / CMP / 00108800.DOC v1}         **COMPLAINT**



109.    In 2005, 2006 and 2007, McMurray repeatedly expressed his concern over the potential impact of the "matching strategy," warning Defendant Sambol in a June 14, 2005 email that: "As a consequence of CW's strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas. While I'm sure you already know this, I think we should be very deliberate since the outer boundaries are potentially controversial and have high expected default rates and losses."

110.    Ten days later, on June 24, 2005, McMurray sent another email to Defendant Sambol, expressing his strong reservations regarding Countrywide's practice of matching the "outer boundaries" of any competitor's most aggressive mortgage loan offerings, a practice which he noted was a "critical component of [Countrywide 's] corporate strategy." McMurray explained that, because Countrywide mixed and matched the most aggressive guidelines from various lenders in the industry, Countrywide's "composite guides are likely among the most aggressive in the industry." McMurray later testified in the SEC Action that the matching strategy at Countrywide was a "corporate principle and practice that had a profound effect on credit policy" at Countrywide.

111.    McMurray explained that Countrywide's "matching strategy" ensured that Countrywide was the most aggressive originator in the market: "And so . . . if you match one lender on—on one—on certain guidelines or for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that—of that two-step match would be more—would be more aggressive than either one of those competitor reference points viewed in isolation." McMurray repeatedly explained his view and the risks of the "matching strategy" to others within Countrywide, including Defendant Sambol, but these concerns were ignored.

112.    McMurray restated his concerns in a November 2, 2006 email that was forwarded to Defendant Sambol, in which McMurray explained that when the composite matching strategy "is done across multiple lenders, across products and across guidelines, the composite set of guidelines will be the most aggressive credit in the market." He continued: "With this approach, our credit policy is ceded, on both a product-by-product as well as item-by-item basis, to the most aggressive lenders in the market. McMurray questioned whether "we want to effectively cede our policy and



1  is this approach 'saleable' for a risk perspective to those constituents who may worry about our risk

2  profile?" Again, Sambol ignored these concerns and Countrywide continued to employ this

3  strategy.

4       113.   Countrywide never disclosed to Plaintiffs or other investors that it had a matching

5  strategy that caused the Company to cede its credit policy to the most aggressive lenders in the

6  market. Although executives knew that the quality of loans originated by Countrywide was

7  deteriorating, and would continue to worsen, they concealed this information from investors.

8  Indeed, a February 11, 2007 email from McMurray to Sambol, stating that "he doubted

9  Countrywide's composite matching strategy "would play well with regulators, investors, rating

10  agencies" confirms that this strategy was not disclosed to anyone outside Countrywide. McMurray

11  expressed concern that "[t]o some, this approach might seem like we've simply ceded our risk

12  standards and balance sheet to whoever has the most liberal guidelines." Information that

13  Countrywide was actually the most aggressive lender in the industry would have been extremely

14  material to Plaintiffs and other investors. As Stifel Nicolaus analyst, Brendler, testified in the SEC

15  Action, disclosure of the "matching strategy" "would have been a very disturbing disclosure."

16  Knowing that Countrywide was "basically seeking out the most aggressive policies and

17  underwriting guidelines of [its] competitors without consideration for other factors" meant that

18  Countrywide was "essentially creating a worst of the worst."

19        **2.**     **Countrywide's Secondary Markets Structured Loan**

20              **Desk Abandoned All Underwriting Standards,**

21              **Approving Any Loan, Regardless Of Its Credit Risk,**

22              **As Long As The Loan Could Be Resold And Securitized**

23       114.   In an effort to maximize its ability to create more MBS, Countrywide implemented a

24  third, even riskier tier of exceptions in early 2005 through which any loan application would be

25  approved as long as it could be resold in the secondary market. If the loan could be resold it would

26  be approved, regardless of whether it met Countrywide's underwriting guidelines or the most

27  aggressive of any competitor's guidelines. The risks, of course, would be transferred from

28  Countrywide to unsuspecting investors.

29

115.   When a loan application was rejected using the "shadow" exceptions guidelines applied by the Production SLD, the application was sent to the Secondary Markets SLD, a desk set up specifically to approve last-ditch exceptions. Defendant Sambol summarized the theory behind the Secondary Markets SLD in a February 13, 2005 email, explaining that Countrywide "should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal." In contrast to his public statements, as far back as September 2004, Defendant Mozilo circulated an email expressing concern over the "clear deterioration in the credit quality of loans being originated over the past several years" and his opinion that "the trend is getting worse." In reaction to the worsening trend, he stated that Countrywide should "seriously consider securitizing and selling a substantial portion of our current and future subprime residuals."

116.   Before July 2005, the Secondary Markets SLD approved any loan which it believed could be resold and securitized, as long as that loan was a 30-year fixed rate mortgage or an 80/20 adjustable rate mortgage ("ARM")[2]. This changed in the summer of 2005. In a July 28, 2005 email sent by David Spector, Vice President and a board member of each Countrywide Depositor Defendant, to Countrywide's Managing Directors and Secondary Markets senior executives, including Joshua Adler, another Countrywide Depositor Defendant board member, Spector stated that, as a result of "increased demand from Production for exceptions on all products in general and on Pay Option loans in particular," he wanted to update them on "the changes we will be implementing going forward":

---

[2]   80/20 ARMs, are also referred to as "piggyback" mortgages because two loans are taken out simultaneously for the same home, one for 80% of the mortgage and the other for the remaining 20% of the mortgage, the latter being sold at a higher interest rate because the buyer is putting out none of his own cash.

{2481 / CMP / 00108800.DOC v1}                     **COMPLAINT**

As indicated in a previous note, when we first started the SLD, the intent was to be able to offer at least one option for borrowers who wanted exceptions to our underwriting guides. The thought was that we would offer borrower exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs. In addition, both of these programs were set up for Alt A and as such we could price and sell under these programs. *While this process seemed to have worked well in the past, we have been recently seeing increased demand from Production for exceptions on all products in general and Pay Option loans in particular.* In addition, Production has been expressing frustration that we were only offering major exceptions for 5/1 ARMs, and 30-year fixed rates. *As such, to the widest extent possible, we are going to start allowing exceptions on all requests, regardless of loan programs, for loans less than $3 million effective immediately.*

The pricing methodology we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids. We will assume securitization in all cases.

\*        \*        \*

The methodology from a saleability point of view will also be similar to that used for 30-year fixed rates and 5-1 Hybrids. We will view the exception assuming securitization and will no longer take into account whole loan buyers. In the past, this has caused some exceptions to be declined for Ratios, Balances and LTV/CLTV combinations. Provided we can sell all of the credit risk (i.e. not be forced to retain a first loss piece due to a 80% LTV, 60 Back-end ratios $3 million loan) we will approve the loan as a salable loan. Finally, we will not be reviewing loans from an underwriting point of view but will rather be relying on Production to make certain that the loan [sic] meet all other underwriting Guideline and well [sic] have been reviewed for compliance acceptability and fraud.

117.    Individual Defendant Adler, a Countrywide Depositor Defendant board member and Secondary Markets Managing Director, confirmed at his deposition in the SEC Action that the Secondary Markets SLD did not review loans from an underwriting point of view, but reviewed them for their securitization potential only:

Q.    Do you know whether Countrywide sometimes originated loans that were considered to be exceptions to its underwriting guidelines?

A.    We did.

Q.    To your knowledge, was there a process by which such loans were approved?

\*        \*        \*

31

**COMPLAINT**

THE WITNESS: There generally was, yes.

Q.    And what is your understanding of that process?

A.    Well, I was—I was at the tail end of that process. There was—we had guidelines, we had kind of core guidelines, and then we had these shadow guidelines, which were the kind of the second tier guideline, if you will. And then there was this third tier which would come to me. But essentially there were—the tiering of guidelines related to the kind of the exception process. And there was an underwriting, they called it, Structured Loan Desk process in the divisions where loans would get referred to the Structured Loan Desk if they were outside, I believe, of kind of the core guidelines. And then if those loans were outside of even the shadow guidelines, then they would be referred to Secondary Marketing to determine if the loan could be sold given the exception that was being asked for.

                              *       *       *

Q.    Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?

A.    That was the only criteria that we followed.

3.    **The Rampant Use of Exceptions Was Well Known Within Countrywide But Was Concealed From Plaintiffs and Other Investors in the Certificates**

118.   Countrywide's internal documents and its employees' admissions provide evidence that, under management's direction, approval of "exceptions" was the rule—regardless of the risk associated with the loan—and in contravention of (a) its own policy that exceptions could be considered and approved only in moderation, and (b) the Defendants' public statements about Countrywide's underwriting standards. A June 28, 2005 Corporate Credit Risk Committee presentation revealed to senior executives that one-third of the loans rejected by Countrywide's own underwriting guidelines and approved pursuant to exceptions missed "major" underwriting guidelines, and another one-third missed "minor" underwriting guidelines. The presentation also informed the committee that exception-based loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines.

119.    An internal Countrywide presentation created by former Countrywide President and Chief Operating Officer, David Sambol, submitted in a criminal prosecution of a former Countrywide loan officer (*United States v. Partow*, No. 06-CR-00104 (HRH) (D. Alaska 2006)), listed the following objectives for the Exception Processing System:

> Approve virtually every borrower and loan profile with pricing add-on when necessary.
>
> • Identify alternative program to meet borrower needs.
> • Process and price exceptions on standard products for high-risk products.
> • Process exceptions for:
>     — Credit Scores
>     — LTV (loan-to-value) amount
>     — Cash out amounts
>     — Property types

120.    Former Countrywide loan officer Kourosh Partow told an interviewer for Dateline NBC that if a borrower had a pulse, Countrywide would give the borrower a loan.

121.    Mozilo was also acutely aware of the breakdown in Countrywide's procedures and the lack of compliance with Countrywide's underwriting guidelines. For example, in early 2006, HSBC exercised its contractual rights and forced Countrywide to "buy back" many of the subprime 80-20 loans that it had purchased from Countrywide. Many of the HSBC "kick-outs" of defaulted loans were due to the fact that many of the underlying loans had been originated outside of Countrywide's underwriting guidelines. Following the HSBC incident, on April 13, 2006, Mozilo sent an e-mail to Sieracki and Sambol, stating that he had "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." Mozilo further stated that while Sambol frequently called "the 100% subprime seconds the 'milk' of the business, [Mozilo considered] that product line to be the poison [of the business]."

122.    At a March 12, 2007 Corporate Credit Risk Committee meeting, attended by Sambol, Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated severely unsatisfactory or high risk, and that one of the principal

1   causes for the poor rating was that loans had debt-to-income, loan to value, or FICO scores outside

2   Countrywide's underwriting guidelines.

3       123.   On May 29, 2007, Sambol attended a Credit Risk Committee Meeting, during which

4   he was informed that even as Countrywide had been purportedly tightening guidelines, "loans

5   continue[d] to be originated outside guidelines" primarily via the Secondary Structured Lending

6   Desk without "formal guidance or governance surrounding Secondary SID approvals." The

7   presentation also included a recommendation from the credit management department that two

8   divisions "cease to grant exceptions where no major competitor is offering the guideline."

9       124.   Countrywide's admission of its secret, rampant, and unjustified use of the exceptions

10   process is further corroborated by the particularized allegations in a lawsuit by another financial

11   guarantor—*Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc.*, No. 600757

12   (Mar. 24, 2010). The plaintiff in that lawsuit alleges that at two separate meetings between the

13   parties at Countrywide's headquarters on April 24, 2007 and December 13, 2007, Countrywide

14   admitted "that it had, apparently since sometime in 2006, undertaken a deliberate practice to

15   routinely make increased exceptions to and expansion of its underwriting guidelines" in order to

16   "retain [its] existing share of the mortgage origination market." Countrywide also admitted that it

17   had discovered borrower misrepresentation, speculation, and fraud at an increasing rate in 2006,

18   which "had been a significant factor in the underperformance of the 2006 securitized HELOC

19   portfolios."

20       125.   In other recent lawsuits, Countrywide employees have confirmed the prevalence of

21   these practices. One former Countrywide employee quoted in a class action complaint filed by

22   Countrywide debt holders, *Argent Classic Convertible Arbitrage Fund v. Countrywide Financial*

23   *Corp.*, Docket No. 2:07-cv-07097, stated that Countrywide routinely approved loans through the

24   Exception Processing System that violated its underwriting guidelines. Another former

25   Countrywide employee, a former Assistant Vice President of Risk Management with

26   Countrywide's Structured Loan Desk in Plano, Texas and an underwriter from 2004 until 2006

27   responsible for evaluating credit risk, stated that Countrywide's management "encouraged more and

28   more loans" to be processed through the Exception Processing System beginning in 2004. During

1    2006, Countrywide processed between 15,000 and 20,000 loans a month through the Exception

2    Processing System.

3        126.   Similarly, in a wrongful dismissal lawsuit against Countrywide—*Zachary v.*

4    *Countrywide Financial Corp. d/b/a Countrywide Home Loans Inc.*, No. 4:08-cv-00214 (S.D.

5    Tex.)—former Countrywide Regional Vice President Mark Zachary alleged that Countrywide

6    regularly approved stated income or reduced-documentation loans for applicants Countrywide had

7    previously rejected under its full-documentation loan program.  In fact, Countrywide's loan officers

8    would assist applicants in switching from full-documentation loans to reduced-documentation

9    loans.  Zachary alleges that Countrywide discharged him because he refused to engage in this

10    activity.

11        127.   Zachary's allegations, and those of many other former Countrywide employees, are

12    also featured in a shareholders derivative complaint—*In re Countrywide Fin. Corp. Derivative*

13    *Litigation*, Lead Case No. 07-CV-06923 (C.D. Cal. 2007).  In denying Countrywide's motion to

14    dismiss the derivative complaint, the court highlighted Countrywide's dramatic loosening of its

15    underwriting standards in branches across the United States.  Specifically, the court held that the

16    "numerous confidential witnesses support a strong inference of a Company-wide culture that, at

17    every level, emphasized increased loan origination volume in derogation of underwriting

18    standards."  In drawing this inference, the court noted that the allegations of misconduct came from

19    Countrywide employees (a) located throughout the United States, (b) in varying levels of the

20    Countrywide hierarchy (including underwriters, senior underwriters, senior loan officers, vice

21    presidents, auditors, and external consultants), and (c) employed at varying times.  In the court's

22    words, these witnesses "tell what is essentially the same story—a rampant disregard for

23    underwriting standards from markedly different angles."

24        128.   The Court's holding was supported by references to, among other things, the

25    particular allegations of a longtime Countrywide executive who stated "that particularly risky loans

26    that were routed out of the normal underwriting process (because they violated underwriting

27    standards) were in fact regularly being approved" with the knowledge of Defendant Sambol.  The

28    Court similarly noted that "underwriters at various levels and offices attested to egregious instances

1    of underwriting, involving, for example, previously declined loans that would 'come back to life'

2    when new information qualifying the applicants would 'miraculously appear,' and loans that were

3    provided pursuant to borrowers' patently ridiculous 'stated incomes.'" *In re Countrywide Fin.*

4    *Corp. Derivative Litigation*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008).

5        129.    The complaint in a shareholder class action, *In re Countrywide Financial Corp.*

6    *Securities Litigation*, No. 2:07-cv-05295 (C.D. Cal), similarly alleges, based on statements from a

7    loan underwriter in Countrywide's Consumer Markets Division, that "loan applications that should

8    never have been approved were constantly kicked further up the corporate ladder until they reached

9    a level where they would be approved by those driven solely by corporate profits and greed."

10        130.    The United States District Court denied Countrywide's motion to dismiss the federal

11    scienter-based claims in the shareholder class action, holding that the allegations "present the

12    extraordinary case where a company's essential operations were so at odds with the company's

13    public statements that many statements that would not be actionable in the vast majority of cases

14    are rendered cognizable to the securities laws." *In re Countrywide Financial Corporation*

15    *Securities Litigation*, 585 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008). The Court explained that

16    descriptions like "high quality' are generally not actionable; they are vague and subjective puffery

17    not capable of being material as a matter of law." But here, the complaint "adequately alleges that

18    Countrywide so departed from its public statements that even 'high quality' became materially false

19    or misleading." Countrywide recently agreed to pay $600 million to settle this lawsuit.

20
21    **E.    Countrywide Knew that their Limited or Reduced Documentation**
         **Loans Were Not Prudently Underwritten and Were Likely to Suffer**
22
         **Significant Defaults and Deficiencies, But Concealed These Facts from**
23
         **Plaintiffs and Other Investors in the Certificates**
24

25        131.    Countrywide also routinely approved loans in which a borrower's income and/or

26    assets were not verified. Such loans were called "limited" or "reduced" documentation loans, and a

      large subset were called "stated income loans." These loans allowed a borrower to simply state his
27
      or her income without providing any documentation or proof of income. Employment was
28

1    supposed to verbally confirmed, and income was supposed to be roughly consistent with incomes

2    earned in the type of job claimed by the borrower. However, Countrywide employees deliberated

3    failed to take any steps to verify income information. The quality of these "stated income" loans

4    was further compromised by Countrywide loan officers who actively assisted loan applicants in

5    falsifying their loan applications, most commonly by counseling them to lie about their incomes

6    and assets.

7         132.    The Mortgage Guaranty Insurance Arbitration (the "Mortgage Guaranty Action")

8    demonstrates Countrywide's fraud in this area. In Mortgage Guarantee's demand against

9    Countrywide to exercise its right to refuse to pay insurance claims on stated-income loans on which

10   the borrowers defaulted, Mortgage Guarantee alleges that Countrywide's representations regarding

11   the loans were "riddled with materially false information." In order to support its demand,

12   Mortgage Guaranty hired investigators to root out representative examples of Countrywide's fraud,

13   and provided ten of these representative examples in the complaint. In one example ("MGIC

14   Certificate No. 25797915"), a borrower's application listed his occupation as a dairy foreman with a

15   monthly stated income of $10,500. With those credentials, he qualified for a $350,000 primary

16   residence mortgage loan with a reported debt-to-income ("DTI") ratio of 43.26%, within Mortgage

17   Guaranty's eligibility threshold. After the borrower defaulted and Countrywide submitted a claim

18   to Mortgage Guaranty, the insurer investigated the claim and uncovered the following facts: the

19   borrower was actually a dairy milker making $1,100 per month who was not purchasing the home

20   as a primary residence, and had a DTI of 405.40%, nearly ten times higher than what was

21   represented by Countrywide. What is most shocking is that the borrower disclosed all of this

22   information to the Countrywide loan officer and nevertheless obtained a $350,000 mortgage.

23        133.    The other examples in the Mortgage Guaranty Action provide similar evidence of

24   misfeasance, including inflated debt to income based on falsified income and loan-to-value ratios

25   due to falsified appraisals, along with other deficiencies, all stemming from stated or reduced

26   documentation loan applications which made it easy for the borrower and loan officer to falsify

27   information. The Mortgage Guaranty complaint alleges that "[b]y about 2006, Countrywide's

28

1 | internal risk assessors knew that in a substantial number of its stated-income loans—fully a third—

2 | borrowers overstated income by more than 50 percent."

3 |      134.    Mark Zachary, a former Countrywide executive, alleges in his wrongful termination

4 | complaint that Countrywide was aware of false information supplied by borrowers' for loan

5 | approval in stated income loans. According to Zachary, around 2006, Countrywide loan officers

6 | engaged in a practice known within Countrywide as "flipping" an application. Loan officers who

7 | learned that a loan application submitted under the full documentation program was unlikely to be

8 | approved "flipped" the application for consideration under a reduced documentation application

9 | program. According to Zachary, loan officers coached applicants on the level of employment

10 | income needed to qualify for a mortgage loan, and then accepted revised loan applications

11 | containing inflated reported incomes. The loan officers submitted the revised loan applications

12 | under a reduced documentation program for consideration by the Structured Loan Desk in Plano,

13 | Texas and Calabasas, California. According to Zachary, he complained to Countrywide's regional

14 | management about these practices, but his complaints were ignored.

15 |      135.    Zachary's complaint also describes an instance where a Countrywide loan officer

16 | inflated an applicant's income on a loan application without the applicant's knowledge. According

17 | to Zachary, the customer sent an e-mail to Countrywide stating: "I was told that my loan had been

18 | turned over to Countrywide's internal fraud department for review because a loan officer increased

19 | my income figures without authorization in order to get me approved for a stated income loan. I

20 | was told by several people at Countrywide that this was done just to get me qualified and that

21 | nobody would check on it."

22 |      136.    Audrey Sweet of Maple Heights, Ohio, a victim of Countrywide's predatory lending

23 | practices, told a similar story of falsified loan documents in her testimony before the Joint

24 | Economic Committee of Congress on July 25, 2007. Ms. Sweet stated that when she reviewed her

25 | loan application after her loan had closed, she

26 |         discovered several things [she] had apparently overlooked until then.
        The first was that my gross monthly income was recorded as $726

27 |         dollars more than it actually was. Secondly, I have two sets of loan
        documents, one that was created 10 days before we closed and one

28 |         that was created the day of closing. The closing day documents list

my assets as $9,400 in my Charter One Bank Account. I have never had $9,400 in the bank. Indeed, coming up on payday, I am fortunate to have $94 left. The final item I noticed was that the tax amount listed on the appraisal report was $1981.34, which comes to about $165.00 per month but Countrywide listed $100 as the tax amount.

137. These individual cases of inflated borrower income are not isolated incidents. Instead, they are the product of Countrywide's corporate culture, as former Countrywide employees have made clear in related litigations.

138. For example, the complaint in *In re Countrywide Financial Corp. Derivative Litigation* relies upon: (i) statements from a compliance officer who worked at Countrywide from 2001 to mid-2007; (ii) statements from an external home loan consultant who worked at Countrywide from 2000 to 2007 and was responsible for originating prime loans for the residential market; and (iii) statements of a former senior loan officer from Countrywide's Consumer Markets division in Atlanta, Georgia, in support of its allegations that Countrywide's no-documentation loan process lacked independent verification and was openly abused.

139. The second consolidated class action complaint in *In re Countrywide Financial Corporation Securities Litigation*, No. 2:07-cv-05295 (C.D. Cal.), alleges based on statements from a Countrywide corporate-level Senior Vice President involved in financial reporting and analysis until 2007, that it was generally known at Countrywide that "there was a lot of lying going on" in connection with stated income and stated asset loans.

140. And in an NBC News report, one former Countrywide loan officer said that he had seen Countrywide supervisors stand by and watch as loan officers repeatedly entered fictitious income figures into Countrywide's system until it approved the borrower for a loan. A borrower stated in the same report that a Countrywide loan officer advised her to double her salary when completing her own loan application.

141. Since 2008, Attorneys General from various states have investigated Countrywide's lending practices and relying on internal Countrywide documents and insider testimony charged that Countrywide systematically departed from its represented underwriting standards. For example, the Illinois Attorney General investigated Countrywide's loan practices and, on June 25, 2008, filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois,

39

1 entitled *Illinois v. Countrywide Financial Corp., et al.*, No. 08CH22994 (the "Illinois AG

2 Complaint"). The California Attorney General also investigated Countrywide's lending activities

3 and filed a complaint in the Northwest District of the Superior Court for Los Angeles County,

4 entitled *California v. Countrywide Financial Corp., et al.*, No. LC081846 (the "California AG

5 Complaint"). Many of the allegations in the Illinois and California AG Complaints were

6 corroborated by investigations in other states such as Connecticut, Washington, West Virginia,

7 Indiana and Florida. Significantly, on October 6, 2008, Countrywide announced that it had settled

8 the claims brought by 11 states, including California and Illinois, agreeing to implement an

9 estimated $8.4 billion program to modify pre-2008 Countrywide-originated mortgages.

10   142. According to the Illinois AG Complaint, Countrywide employees stated that

11 Countrywide originated loans that did not meet its underwriting criteria because Countrywide

12 employees were incentivized to increase the number of loan originations without concern for

13 whether the borrowers were able to repay the loans. With respect to stated income loans,

14 Countrywide employees explained to the Illinois AG that, while the Company had a

15 "reasonableness standard" in order to check fraudulent stated income, employees were only

16 required to use their judgment in deciding whether or not a stated income loan seemed reasonable.

17 To supplement an employee's judgment as to whether or not a potential borrower's income was

18 "reasonable," beginning in 2005, Countrywide required its employees to utilize a website,

19 www.salary.com, to determine the reasonableness of a potential borrower's stated income.

20 However, this website was actually used by Countrywide employees to gauge how much income

21 needed to be "stated" in order to approve the loan, regardless of whether that stated income was

22 legitimate. Even if the stated salary was outside of the range provided by the website, Countrywide

23 employees could still approve the loan.

24   143. A former California loan officer for Countrywide quoted in the California AG

25 Complaint further explained that Countrywide's loan officers typically explained to potential

26 borrowers that "with your credit score of X, for this house, and to make X payment, X is the

27 income that you need to make," after which the borrower would state that he or she made X amount

28 of income.

144. The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income. For example, according to the Illinois AG Complaint: (a) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (b) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

145. Similar to the Illinois AG Complaint, the California AG Complaint also alleged that Countrywide departed from its stated underwriting standards. For example, the Complaint alleged that employees were pressured to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and failing to verify documentation and information provided by borrowers that allowed them to qualify for loans.

146. Many of these inflated incomes were in the loan files of Pay Option loans, an adjustable rate mortgage loan product that was ostensibly a "prime" or near prime product. Countrywide represented to Plaintiffs that a large percentage of the underlying loans originated by Countrywide Home and contained within the Certificates were "prime," or "conventional," indicating that these loans were of high credit quality. Included within this "prime" category of loans were Pay-Option ARM loans. Pay-Option ARM loans are adjustable rate mortgages which provide borrowers with the option of fully-amortizing, interest-only, or "negative amortizing" payments. Pay-Option loans increased from approximately 6% of loan production by year-end 2004 to approximately 19% by year-end 2005. In its 10-K for 2005, Countrywide assured the public that its Pay-Option loan portfolio had "a relatively high initial loan quality," and that it "only originate[d] pay-option loans to borrowers who [could] qualify at the loan's fully-indexed interest rates."

147. Countrywide Defendants repeatedly represented that Pay-Option ARM loans were prudently underwritten and of high quality. In 2005 and 2006, Mozilo made public statements touting Countrywide's Pay-Option ARM loans, stating, for example, that: "We are a big player in

41
**COMPLAINT**

1   the pay-option and I/O product. I'm not aware of any loosening of underwriting standards that

2   creates any less of a quality of loan than we did in the past" (July 26, 2005 Second Quarter

3   Earnings call); "pay option loan quality remains extremely high" (April 27, 2006 First Quarter

4   Earnings call); Countrywide's "origination activities are such that, the consumer is underwritten at

5   the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be

6   required, when they reach their reset period" (*id.*); "Countrywide views the product as a sound

7   investment for our Bank and a sound financial management tool for customers" (May 31, 2006

8   Sanford Bernstein Conference); "Performance profile of [the Pay-Option ARM loan] is well-

9   understood because of its 20-year history, which includes 'stress tests' in difficult environments"

10  (*id.*); "[t]o help protect our bond holder customers, we engage in prudent underwriting guidelines"

11  with respect to Pay-Option loans (September 13, 2006 Fixed Income Investor Forum). In addition,

12  Countrywide's 2006 Form 10-K stated that "[w]e believe we have prudently underwritten" Pay-

13  Option ARM loans.

14          148.    Contrary to Defendant's statements in 2005, 2006 and 2007 characterizing Pay-

15  Option ARM loans as being of "high credit quality," "prudently underwritten" and "prime,"

16  Defendants knew that a large percentage of these Pay-Option ARM loans were originated based on

17  the borrowers' stated income, meaning that the borrowers provided no documentation proving their

18  income. While touting the security of the Pay-Option ARM loan products in public, Defendant

19  Mozilo raised resounding alarms within Countrywide regarding the Company's risky reliance on

20  stated income and reduced documentation for these loans but concealed his concerns from Plaintiffs

21  and other investors.

22          149.    For example, on April 4, 2006, in an internal email to Sambol regarding Pay-Option

23  ARM loans, Mozilo stated "[s]ince over 70% [of borrowers] have opted to make the lower payment

24  it appears that it is just a matter of time that we will be faced with much higher resets and therefore

25  much higher delinquencies." Shortly thereafter, on May 19, 2006, Mozilo wrote an email to

26  Sambol and Sieracki, stating that Pay Option loans presented a long term problem "unless [interest]

27  rates are reduced dramatically from this level and there are no indications, absent another terrorist

28  attack, that this will happen." On June 1, 2006, Mozilo advised Sambol in an email that he had

1   become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced

2   documentation basis and that there was evidence that borrowers were lying about their income in

3   the application process. On September 25, 2006, Mozilo wrote another email to Sambol and

4   Sieracki, stating that "[w]e have no way with reasonable certainty, to assess the real risk of holding

5   these loans on our balance sheet." Indeed, in the fall of 2006, Mozilo even recommended selling

6   Countrywide's portfolio of Pay-Option ARM loans, recognizing the risks of retaining them on

7   Countrywide's balance sheet.

8        150.   By early 2006, the management at Countrywide had been informed that the

9   borrowers for one-third of the Pay Option loans held for investment at Countrywide had overstated

10   their income by 50% or more. Countrywide's Quality Control group performed a "4506 Audit" for

11   the 10-month period ended on April 30, 2006, comparing the stated income from a borrower's loan

12   application to the income reported by that borrower to the Internal Revenue Service, and concluded

13   that one-third of the Pay Option loans held for investment at Countrywide had income that was

14   overstated by 50% or more. This audit report was distributed to Countrywide's management and

15   was discussed at an April 24, 2006 Credit Risk Management Committee meeting. Countrywide's

16   Credit Risk Officer, Clifford Rossi, testified before the SEC that the "vast majority" of the income

17   discrepancies revealed in the 4506 Audit were the result of fraud and misrepresentation.

18       151.   The results of the 4506 Audit were widely known within Countrywide, having been

19   reported to the Credit Risk Committee, Countrywide's Chief Risk Officer, and Defendant Sambol,

20   then head of loan production. Sambol also shared the results of the audit with Mozilo, as reflected

21   in a June 1, 2006 email from Mozilo, in which he wrote:

22           In a discussion with both Stan [Kurland] and Dave [Sambol] it came
            to my attention that the majority of pay options being originated by us

23           both wholesale and retail are based upon stated income. There is also
            some evidence that the information that the borrower is providing us

24           relative to their income does not match up with IRS records.

25       152.   Countrywide did not reveal in either the Offering Documents or in other public

26   disclosures the number or proportion of Pay-Option ARM loans that were based on stated income.

27   Moreover, although Countrywide did disclose the percentage of loans that were approved based on

28

1   reduced documentation, including stated income; it did not disclose the results of the 4506 Audit

2   demonstrating that a large percentage of the stated income information was misstated.

3       153.    Countrywide was not surprised by the results of the 4506 audit because the

4   Company knew that its underwriting practices allowed, and in many cases encouraged, fraudulent

5   information regarding income and employment.

6   **F.      Countrywide Retained the Best Quality Loans for Its Own Portfolio,**

7   **Selling Only the Riskiest Loans to Plaintiffs and Other Investors**

8       154.    Countrywide represented in the Prospectus Supplements that it would not select

9   loans for securitization "in a manner intended to affect the interests of the certificate holders

10  adversely."  This representation was material to Plaintiffs because they relied on Countrywide's

11  assurance that the loans included in the pools for the Certificates were high-quality loans with low

12  credit risk.

13      155.    In reality, it was Countrywide's practice to act adversely to the interests of Plaintiffs

14  and other Certificate investors.  First, as described above, Countrywide's Secondary Markets SLID

15  was created for the sole purpose of approving otherwise unapprovable loans as long as they could

16  be sold in their entirety through securitizations.  Second, Countrywide protected its own investment

17  portfolio, choosing only the best quality loans for retention, while unloading the riskiest loans to

18  secondary market investors, including Plaintiffs.

19      156.    In the SEC Action, Countrywide's former Chief Risk Officer, Clifford Rossi,

20  testified that Countrywide generally tried to "cherry-pick" the best of the Countrywide Home loan

21  production for its own investment portfolio.  Rossi stated that "the general strategy that had been

22  provided to me from people like Carlos Garcia [Executive Managing Director of Banking and

23  Insurance at Countrywide] and Jim Furash [President of Countrywide Bank] and that would have

24  been conveyed back again from the parent was that . . . the bank was to originate and to cherry pick

25  the better quality assets."

26      157.    Defendants knew that this practice of cherry-picking the higher quality loans for

27  Countrywide's portfolio would adversely affect the secondary market securitizations.  In an August

28  2, 2005 email from Defendant Sambol to Carlos Garcia and Defendants Mozilo and Kurland (CEO,

1  President and Chairman of each of the Countrywide Depositor Defendants), Sambol wrote: "While

2  it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the

3  securitization implications on what remains if the bank is only cherry picking and what remains to

4  be securitized/sold is overly concentrated with higher risk loans."

5       **G.**   **Countrywide Pressured Appraisers To Submit Falsified Appraisal Reports**

6       158.   In addition to abandoning their underwriting guidelines Countrywide also failed to

7  conduct independent appraisals despite the fact that all the Countrywide Prospectus Supplements

8  represented that the mortgaged properties would be evaluated by independent appraisers.

9       159.   Countrywide allowed sales personnel or account executives to order and control the

10  appraisal process. These personnel were typically on a commission-only pay structure and were

11  therefore motivated to close as many loans as possible. Countrywide sales personnel and account

12  executives would pressure appraisers to appraise properties at artificially high levels or they would

13  not be hired again.

14       160.   According to the April 7, 2010 FCIC testimony of Richard Bitner, a former

15  executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of*

16  *a Subprime Lender,* "the appraisal process [was] highly susceptible to manipulation, lenders had to

17  conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of

18  appraisers were incompetent or they were influenced by brokers to increase the value." He stated

19  that "half of all the loans we underwrote were overvalued by as much 10% . . . .[a]nother quarter

20  that we reviewed were overvalued by 11-20% . . . [and] the remaining 25% of appraisals that we

21  initially underwrote were so overvalued they defied all logic. Throwing a dart at a board while

22  blindfolded would've produced more accurate results."

23       161.   Alan Hummel, Chair of the Appraisal Institute, testified before the Senate

24  Committee on Banking that the dynamic between mortgage originators and appraisers created a

25  "terrible conflict of interest" where appraisers "experience[d] systemic problems of coercion" and

26  were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use'

27  lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals

28

1  done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for

2  doing so.

3  162.  A 2007 survey of 1,200 appraisers conducted by October Research Corp., which

4  publishes *Valuation Review,* found that 90% of appraisers reported that mortgage brokers and

5  others pressured them to raise property valuations to enable deals to go through. This figure was

6  nearly double the findings of a similar study conducted just three years earlier. The 2007 study also

7  "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their

8  appraisal, and provide a higher valuation."

9  163.  The representative loan file investigation performed in the Mortgage Guaranty

10  Action also corroborates the prevalence of a corrupt appraisal process which resulted in inflated

11  appraisals on Countrywide's mortgaged properties. For example, the mortgaged property in MGIC

12  Certificate No. 25616573 was a home in Atlanta, Georgia, with a reported appraisal value of

13  $395,500. Based on the appraised value and a 10% down payment of $39,500, that borrower's

14  $355,500 loan carried a LTV ratio of 90%. After the borrower defaulted and Mortgage Guaranty

15  received Countrywide's insurance claim, Mortgage Guaranty discovered that there was no

16  reasonable basis for the appraisal based on past home prices, and that the fair market value was

17  actually $277,000, with a LTV ratio of 128.34%.

18  164.  In *Capitol West Appraisals, LLC v. Countrywide Financial Corp.,* (No. 2:08-cv-

19  01520 (W.D. Wash.), *Clark v. Countrywide Home Loans, Inc.,* No. 2:09-cv-0036 (W.D. Wash.) and

20  *Johnson v. KB Home,* No. 2:09-cv-00972 (D. Ariz.)—putative class actions filed on behalf of real

21  estate appraisers and homeowners nationwide—the plaintiffs allege that Countrywide engaged in

22  widespread appraisal-related misconduct by inflating the value of properties in order to support the

23  loans that it wished to make. Plaintiffs in *Clark* allege that Countrywide often required the

24  borrower to have the property appraised by its affiliates, LandSafe, Inc. and LandSafe Appraisal

25  Services, Inc. This way, Countrywide was able to control the appraisal process and influence and

26  inflate the appraised values assigned to properties on which it was lending. Plaintiffs in these

27  lawsuits allege that this conduct violated the federal law requiring appraisals prepared by an in-

28  house or "staff appraiser" at a bank—as opposed to an independent contractor—to "be independent

1  of the lending, investment, and collection functions and not involved, except as an appraiser, in the

2  federally related transactions, and have no direct or indirect interest, financial or otherwise, in the

3  property." Further, Countrywide "engaged in a practice of pressuring and intimidating appraisers

4  into using appraisal techniques that meet Countrywide's business objectives even if the use of such

5  appraisal technique is improper and in violation of industry standards." Countrywide allegedly

6  black-listed appraisers who did not provide appraisal reports consistent with Countrywide's

7  expectations.

8       165.    The allegations in *Capitol West Appraisals, Clark,* and *Johnson* are consistent with

9  the allegations of former Countrywide Regional Vice President Mark Zachary, who alleges that

10  Countrywide loan officers were permitted to discard appraisals that did not support loan

11  transactions in favor of appraisals by replacement appraisers that would support a qualifying loan-

12  to-value ratio. Indeed, Zachary's lawsuit details systematic appraisal fraud perpetrated by

13  Countrywide with the knowledge and acquiescence of Countrywide executives. Specifically,

14  Zachary alleges that an appraiser known to Countrywide executives was strongly encouraged to

15  inflate the appraised value of homes by as much as six percent to allow the homeowners to "roll up"

16  all closing costs. As Zachary noted, this conduct misled the buyer and the secondary mortgage

17  market by overstating the value of the property securing the mortgage note. Zachary alleges that

18  Countrywide executives rebuffed his persistent overtures to address this issue.

19       166.    As a result of the appraisal process misconduct described above, the appraised value

20  of properties that secured the loans underlying the Certificates was inflated.

21      **H.**    **The Credit Ratings Assigned to Countrywide's and Bank of America's**

22             **Certificates Materially Misrepresented the Credit Risk of the Certificates**

23       167.    The AAA credit rating of the Certificates was an important factor in Plaintiffs'

24  decision to purchase the Certificates. Because Plaintiffs are conservative institutional investors,

25  they purchased only investment-grade Certificates, all of which were rated "AAA" by S&P or Fitch

26  or "Aaa" by Moody's.

27       168.    Investment grade securities are understood by investors to be stable, safe and secure.

28  A rating of AAA denotes high credit quality, and is the same rating as those typically assigned to

1  bonds backed by the full faith and credit of the United States Government, such as treasury bills.

2  Historically, before 2007, investments with AAA ratings had an expected cumulative loss rate of

3  less than 0.5%, with an annual loss rate of close to zero. According to Standard and Poors, the

4  default rate on all investment grade corporate bonds (including AA, A and BBB from 1981 to

5  2007, for example, averaged about .094% per year with no year higher than 0.41%.

6       169.    While a rating downgrade of even one level—e.g., from AAA to AA or from Aaa to

7  Aa—may be material to the financial condition of the rated entity or security, here, the magnitude

8  of the Certificate downgrades is unprecedented. All seven Certificates that were initially awarded

9  highest grade ratings ("AAA" or "Aaa"), have been downgraded to junk status. See Exhibit 3. The

10  en masse downgrade of top-rated Certificates indicates that the ratings set forth in the Offering

11  Documents were false, unreliable and inflated when made.

12       170.    Unbeknownst to Plaintiffs, at all relevant times, Defendant knew that the ratings

13  were not reliable because those ratings were bought and paid for, and were supported by, flawed

14  information provided by the Defendants to the rating agencies. In fact, Countrywide manipulated

15  the rating agencies to obtain the desired ratings for the Certificates.

16       171.    The credit rating agencies received enormous revenue from the issuers who paid

17  them for rating the products they sold. Because the desired rating of a securitized product was the

18  starting point for any securities offering, the credit rating agencies were actively involved in helping

19  Countrywide structure the products to achieve the requested rating. As a result, the credit rating

20  agencies essentially worked backwards, starting with Countrywide's target rating and thereafter

21  working toward a structure that could conceivably yield the desired rating. To estimate the

22  expected losses or probability of default, the credit rating agencies used historical data to estimate

23  the likely sensitivity of the expected loss or probability of default to underwriting characteristics of

24  the loan, the experience of the originator and servicer, and the local and national economic

25  conditions. Based on the expected losses or the probability of default, the cash flows available to

26  each of the tranches were simulated. Once the cash flows were simulated, the rating agencies and

27  Countrywide then determined how much credit enhancement would be made available to each

28  tranche of the Certificates, with an ultimate goal of maximizing Countrywide's profit.

172.    A 2008 SEC Report entitled "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies" ("Summary Report") revealed that the issuers and the credit rating agencies worked together so that securities would receive the highest ratings:

> [T]ypically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, *i.e.*, to provide the least amount of credit enhancement possible, since the senior tranche—as the highest rated tranche—pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

173.    As a result of this collaboration with the credit rating agencies, Countrywide was able to manipulate the system to achieve inflated ratings. For example, through repeated interactions with the credit rating agencies, Countrywide could effectively reverse engineer aspects of the ratings models and then modify the structure of a financing to improve its ratings without actually improving its credit quality.

174.    This rating process was further compromised by the practice of "rating shopping." Countrywide did not pay for the credit rating agencies' services until after the agencies submitted a preliminary rating. This practice created, essentially, bidding wars where the issuers would hire the agency that provided the highest rating for the lowest price. The credit rating agencies were paid only if they provided the desired investment grade ratings, and only in the event that the transaction closed with those ratings. "Ratings shopping" jeopardized the integrity and independence of the rating process. The credit rating agencies therefore knew that their ratings were heavily influenced by Countrywide and were unreliable and misleading when rendered.

175.    The credit ratings of the Certificates were further compromised by misinformation provided by Countrywide regarding the abandonment of its underwriting standards, rampant use of

aggressive exceptions, the company's knowledge of pervasive fraud in the stated income loan programs, and the inflated appraisals assigned to the underlying collateral, as described above.

176. The Countrywide Defendants well understood (and banked on) the important role the credit ratings played in the MBS markets. They featured the ratings prominently in the Offering Documents and discussed at length the ratings received by the different tranches of the Certificates, and the bases for the ratings. Yet, the Countrywide Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by the Defendants to the credit rating agencies. The Certificates did not deserve these investment grade ratings, as evidenced most clearly by the fact that six out of seven Certificates have now been downgraded to junk. Furthermore, a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default.

177. Likewise the Bank of America Defendants knew that the "AAA" S&P rating assigned to the BOAMS 2007-3 certificate was untruthful because Bank of America had similarly compromised its appraisal and underwriting standards, thus rendering their statements in the Prospectus and Prospectus Supplements relating to the credit rating materially misleading.

178. Further, the terms sheets for BOAMS 2007-3 represented that the average FICO score was 751, and the average LTV ratio was 71.8%. A mortgage with these "prime loan" characteristics could be expected to generate a minimal percentage of defaults based upon historical loss data of comparable securities. The fact that these loan pools had nearly 16% of their loans delinquent 90 days or more and were downgraded to junk status provides strong evidence that Bank of America's underwriting standards had been compromised, and the loans were not underwritten in accordance with Bank of America's representations. *See* Exhibits 3 and 4.

### I.    Countrywide Misrepresented the Transfer of Good Title

179.    An essential aspect of the mortgage securitization process is that the issuing trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process—a promissory note and a security instrument (either a mortgage or a deed of trust).

180.    The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law). Generally, state laws and the PSAs require the promissory note and security instrument to be transferred by endorsement, in the same way that a check can be transferred by endorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

181.    In order to preserve the bankruptcy-remote status of the issuing trusts in MBS transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originator to the trust. Rather, the notes and security instruments are generally initially transferred from the originator (e.g., Countrywide Home) to the depositor (e.g., CWALT), either directly or via one or more special-purpose entities established by the parent company (e.g. Countrywide Financial). After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

182.    In addition, the PSA generally requires that the transfers of mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust qualifies as a tax-free real estate mortgage investment conduit ("REMIC").

183.    The applicable state trust law generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, endorsement, physical delivery, and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

184.    The Offering Documents for each offering of the Certificates represented in substance that the issuing trust for that offering had obtained good title to the mortgage loans comprising the pool for the offering.  In reality, however, Countrywide routinely failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments to the issuing trusts.  In *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide sought to prove that the Bank of New York, as trustee for an RMBS issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage.  Countrywide presented testimony by Linda DeMartini, who had been employed by Countrywide Servicing for almost ten years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing.  Ms. DeMartini testified that, in her extensive career in the mortgage loan servicing business of Countrywide, "I had to know about everything . . . ."  She testified that Countrywide Home originated Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but that Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer for the loan.

185.    Even though DeMartini was presented by Countrywide as a witness in an attempt to prove that the loan documents had been validly transferred to the issuing trust, her testimony actually proved that the loan documents were never validly transferred.  She testified that an allonge to the promissory note, which purported to transfer the note to the trust by endorsement, was prepared only in preparation for the litigation in 2009, long after the purported transfer of the note

1   to the trust in 2006, and was never delivered to the trustee. Indeed, she testified that there was no

2   ordinary business practice of signing an allonge at the time a note was purportedly transferred.

3       186.   DeMartini also testified that the original note was retained by Countrywide

4   Servicing and was never delivered to the trustee. Most significantly, she testified on direct

5   examination that not delivering the original note to the trustee was Countrywide's standard business

6   practice. She stated that Countrywide practice of retaining the physical document was the "normal

7   course of business.[because] we are the servicer, [and] we're the ones that are doing all the

8   servicing, and that would include retaining the documents.

9       187.   At a subsequent hearing in September 2009, Countrywide's counsel stated that

10          [A]lthough . . . the UCC and the Master Servicing Agreement
            apparently requires that, procedure seems to indicate that they don't
11          physically move documents from place to place because of the fear of
            loss and the trouble involved and the people handling them. They
12          basically execute the necessary documents and retain them as long as
            servicing's retained. The documents only leave when servicing is
13          released.

14      188.   Based on the evidence quoted above, Chief Bankruptcy Judge Judith H. Wizmur

15   held in November 2010 that the Bank of New York, as trustee for the issuing trust, could not

16   enforce the mortgage loan for two reasons:

17          First, under New Jersey's Uniform Commercial Code ("UCC")
            provisions, the fact that the owner of the note, the Bank of New York,
18          never had possession of the note, is fatal to its enforcement. Second,
            upon the sale of the note and mortgage to the Bank of New York, the
19          fact that the note was not properly indorsed to the new owner also
            defeats the enforceability of the note.
20

21   *Kemp v. Countrywide Home Loans, Inc.*, No. 08-18700-JHW, Slip Op., at *10-11 (Bkrtcy. D.N.J.

22   Nov. 16, 2010). Judge Wizmur further held that Countrywide Servicing also could not enforce the

23   mortgage loan, because as an agent for the owner of the note, Countrywide Servicing had no more

24   authority to enforce the note than its principal, the Bank of New York. *Id.* at *21.

25      189.   In this manner, Countrywide routinely did not transfer the original mortgage loan

26   documents to the issuing trusts for MBS transactions, but rather retained the original documents

27   itself. Thus, Defendants failed to validly transfer the promissory notes and security instruments

28   associated with many of the mortgage loans underlying the Certificates purchased by Plaintiffs.

53

**COMPLAINT**

1     **J.     Bank of America Adopts Countrywide's Corrupt Practices**

2         190.    BOAS was the broker for the CWHL 2005-21, and both broker and underwriter for

3     the CWHL 2007-14 and BOAMS 2007-3 Offerings. BOAS, through its due diligence in

4     investigating the underlying loans, knew or should have known of the poor quality of loans in the

5     MBS deals such as CWHL 2007-14, which were materially misrepresented to investors in a July

6     27, 2007 offering. Bank of America adopted similar practices with respect to the BOAMS 07-3

7     MBS offering, which closed on August 29, 2007, as evidenced by the dramatic level of delinquent

8     loans and the rating downgrade to junk status.

9     **VI.    DEFENDANTS' FALSE AND MISLEADING MATERIAL**

10        **MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

11        191.    The Offering Documents, pursuant to which Plaintiffs purchased their Certificates,

12    contained untrue statements of material fact, or omitted to state material facts necessary to make the

13    statements therein not misleading, regarding: (a) Countrywide Home Loans and Banc of America

14    Mortgage Securities' underwriting processes and guidelines by which the loans were originated; (b)

15    the requirements for obtaining a loan under the reduced documentation procedures and the

16    percentage of loans originated pursuant to full documentation procedures; (c) the value of the

17    underlying real estate securing the loans, in terms of LTV ratios and the appraisal standards by

18    which such real estate values were measured; (d) the debt-to-income ratios for each loan group in

19    the underlying loan pool; (e) the credit ratings of the Certificates; and (f) the adequacy of the

20    transfer of good title and legal ownership of the underlying loans to the issuing trusts.

21        **A.     Defendants' False and Misleading Statements**

22            **Regarding Underwriting Guidelines**

23        192.    Countrywide Home Loans originated and/or packaged the mortgage loans that were

24    included in the pools for six of the Certificates. The Prospectus Supplements for these Certificates

25    contained identical or materially similar statements of material fact regarding Countrywide's

26    underwriting standards and practices. Five out of the six Countrywide Prospectus Supplements

27    made the following misrepresentations regarding Countrywide's underwriting guidelines and

28    practices:

All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations. Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program—Underwriting Process" in the prospectus.[3]

193. The remaining Prospectus Supplement (CWHL-2007-18) issued by CWMBS made the following material misrepresentations:

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

194. The Bank of America Prospectus similarly misrepresented that their underwriting standards were adhered to:

The Mortgage Loans have been underwritten materially in accordance with one or more of the following: (i) Bank of America's general underwriting standards . . . (ii) Bank of America's alternative underwriting standards . . . "the underwriting standards used by mortgage loan originators are intended to evaluate the mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."[4]

---

[3] *See* Prospectus Supplements: CWALT 2005-51 S-69; CWHL 2005-21 S-34; CWHL 2006-OA5 S-71; CWHL 2007-14 S-32; and CWHL 2007-17 S-44.

[4] *See* Prospectus for BOAMS 2007-3 p. 28.

195.    All of the Countrywide Prospectus Supplements represented that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."[5]

196.    Similarly, the Bank of America Prospectus represented that Bank of America would make exceptions to their underwriting guidelines.

> Bank of America permits ratios to exceed guideline when the applicant has documented compensating factors such as documented excess funds in reserves after closing, a history of making similarly sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income."[6]

197.    Additionally, all of the Countrywide Prospectus Supplements represented that "Countrywide Home Loans will represent and warrant to the depositor in the pooling and servicing agreement [that] . . . the selection was not made in a manner intended to affect the interests of the certificateholders adversely."[7]

198.    The above statements of material facts were untrue when made because, as explained above in ¶¶ 88-190, Countrywide and Bank of America failed to disclose that they: (a) systematically failed to follow its stated underwriting standards and ignored borrowers' repayment ability; (b) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (c) disregarded credit quality in favor of generating increased loan volume for securitizations; and (d) routinely allowed fraudulent representations of an applicant's stated income and, in many cases, knowingly falsified the stated income. Moreover, Defendants routinely acted adversely to the interests of Plaintiffs and other Certificate holders by selecting risky loans for the Certificates while "cherry picking" the best loans for Countrywide's own portfolio as described *supra* at ¶¶ 154-157.

---

[5] *See* Prospectus Supplements: CWALT 2005-51 S-70; CWHL 2005-21 S-35; CWHL 2006-OA5 S-72; CWHL 2007-14 S-33; CWHL 2007-17 S-45; and CWHL 2007-18 S-38.

[6] *See* BOAMS 2007-3 Prospectus p. 31.

[7] *See* Prospectus Supplements: CWALT 2005-51 S-21; CWHL 2005-21 S-14; CWHL 2006-OA5 S-33; CWHL 2007-14 S-26; CWHL 2007-17 S-37; and CWHL 2007-18 S-30.

199.   In veering from their stated underwriting guidelines Countrywide, as described *supra* at ¶¶ 88-153, disregarded borrowers' repayment ability by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting "stated income" loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualified borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exception to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that was meant to weed out non-qualifying loans and nonetheless approving such loans.

**B.    Defendants' False and Misleading Statements**

   **Regarding the Standards for Obtaining a Loan Under**

   **the Reduced Documentation Programs and the Percentage**

   **of Loans Granted Pursuant to Full-Documentation Procedures**

200.   The CWALT Offering Document at issue here (CWALT 2005-51) detailed the four programs that Countrywide offered where less than full borrower documentation of income, assets and employment were required, but in all instances credit scores had to be obtained, any deficiencies or derogations fully explained to the loan officers and, except for the Streamlined Documentation Program which had limited application, independent appraisals of the mortgage properties obtained—with all appraisals conforming to Fannie Mae and Freddie Mac standards:

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Program ("the CLUES Plus Documentation Program"), a No Income/ No Asset Documentation Program (the "No Income/ No Asset Documentation Program"), a Stated Income/ Stated Asset Documentation Program (the Stated Income/ Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Loan Program").

For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loan obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history . . . installment debt payments and any record of defaults, bankrupt y, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's application is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.[8]

201.    However, measures designed to evaluate the repayment ability of the borrowers who originated loans pursuant to the reduced documentation programs were regularly disregarded. Defendants' statement contained in each Prospectus Supplement that a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan, was materially false.[9] Countrywide failed to disclose that they had implemented reduced documentation programs

---

[8]  See Prospectus Supplement for CWALT 2005-51 S70-71.

[9]  See Prospectus Supplement CWALT 2005-51 S-70; CWHL 2005-21 S-35; CWHL 2006-OA5 S-72; CWHL 2007-14 S-23; CWHL 2007-17 S-45; CWHL 2007-19 S-38; and BOAMS Prospectus p. 28.

1   designed to extend mortgages to borrowers regardless of whether they were able to meet their

2   obligations under the mortgage.

3       202.   Furthermore, each Prospectus Supplement contained detailed statistical information

4   regarding the percentage of mortgages underwritten pursuant to full documentation procedures.  For

5   example, in the CWHl 2006 OA5 Offering, the Prospectus Supplement stated that "as of the cut-

6   off date, none of the Mortgage Loans have been underwritten pursuant to Countrywide Home

7   Loans' Preferred Processing Program" (a reduced documentation program where the loan applicant

8   only had to give Countrywide the right to obtain their tax returns from the preceding two years and

9   other documentation required under the program could be waived). The Prospectus Supplement

10  Further provided that of the 3,337 mortgage loans, 7 were originated under the CLUES program,

11  448 were originated under the Stated Income program, 436 were originated under the Full or

12  Alternative Documentation program and 2,446 were originated under the reduced documentation

13  program.[10]

14      203.   As mentioned in detail above, the use of reduced documentation programs was far

15  more prevalent than what was disclosed in the relevant Prospectus Supplements, despite the fact

16  that the Defendants knew that the loans originated pursuant to these programs were much more

17  likely to default.

18      204.   Reduced documentation loans are riskier because the borrower provides less

19  substantiating information for items such as his or her income or assets.  With less confirmation, it

20  us more likely that there are errors or misrepresentations in the loan files. Whether the information

21  in a loan file was fully documented, or whether it was instead approved pursuant to a no-

22  documentation or reduced documentation program (such as the "Preferred Processing Program"),

23  was, therefore, material to Plaintiffs.

24

25

26

27

28  [10]  See Prospectus Supplement for CWHL 2006 OA5S-72, S-40, S-51 and S-62.;  See also CWHL
    2007-17 S-44; CWHL 2005-21 S-20 and S-27; CWHL 2007-18 S-38; S-32,S-42,S-52 and S-62.

**C.      Defendants' Untrue Statements and**

**Omissions Regarding Appraisals and LTV Ratios**

205.    The Registration Statements also represented that in determining the adequacy of the property to be used as collateral, an appraisal would be made of each property considered for financing.  The Prospectus Supplements represented that *independent* appraisals were prepared for each mortgaged property and that reports were prepared to substantiate these appraisals.  For example, all of the Prospectus Supplements for the Countrywide Certificates contained the following representation:

> Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans . . . .  The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.[11]

206.    Similarly, the Prospectus for the Bank of America Certificate similarly represented that the mortgage properties would be appraised:

> Bank of America conducts a valuation of the mortgaged property as collateral for each mortgage loan.  This collateral valuation may be determined by (i) an interior inspection (ii) a tax assessed value (iii) a desktop appraisal (iv) a drive-by appraisal (v) an automated valuation model (vi) reference to the collateral valuation obtained in connection with the origination of the previous loan if the loan is a refinance of a mortgage loan that was previously serviced by Bank of America.[12]

207.    The Countrywide and Bank of America Prospectuses also provided detailed information regarding LTV ratios, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.

---

[11] *See* Prospectus Supplements: CWALT 2005-51 S-71; CWHL 2005-21 S-35; CWHL 2006-OA5 S-71; CWHL 2007-14 S-33; CWHL 2007-17 S-45; and CWHL 2007-18 S-39.

[12] *See* Prospectus for BOAMS 2007-3 p. 33-34.

1    208.    Certain Prospectus Supplements (CWHL 20051-21. CWHL 2006-OA5, BOAMS

2  2007-3) stated that "[n]o Initial Mortgage Loans had a Loan-to-Value Ratio at origination or on the

3  closing date of more than 95.00%."[13]

4    209.    The remaining CWMBS and CWALT Prospectus Supplements stated that "[n]o

5  Initial Mortgage Loans had a Loan-to-Value Ratio at origination or on the closing date of more than

6  100.00%."[14]

7    210.    The representations regarding appraisals and LTV ratios were materially false and

8  misleading in that they omitted to state that the appraisals were inaccurate because: (a) the

9  appraisers were not independent from Countrywide or Bank of America, which exerted pressure on

10  appraisers to come back with pre-determined, preconceived, inflated and false appraisal values;

11  (b) the appraisers often did not engage in a meaningful inspection, but rather engaged in a "drive-

12  by"; (c) the actual LTV ratios for numerous mortgage loans underlying the Certificates would have

13  exceeded 100% if the underlying properties had been appraised by an independent appraiser as

14  represented in the Offering Documents; and (d) the forms of credit enhancement applicable to

15  certain tranches of the Certificates were affected by the total value of the underlying properties, and

16  thus were inaccurate as stated.

17    **D.    Defendants Misrepresented the Maximum Debt-to-Income**

18        **Ratio Allowed Pursuant to the Underwriting Guidelines**

19    211.    In the Offering Documents for the CWHL 2007-17 Offering, Countrywide

20  represented that "under its underwriting guidelines Countrywide generally permits a debt-to-income

21  ratio based on the borrower's monthly housing expenses of up to 36% and a debt to income ratio

22  based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-

23

24

25

26  [13] *See* Prospectus Supplement CWHL 2005-21 S-17; CWHL 2006-OA5 S-36; and BOAMS 2007-3 S-36.

27  [14] *See* Prospectus Supplement CWALT 2005-51 S-24; CWHL 2007-14 S-27; CWHL 2007-17 S-38; and CWHL 2007-18 S-32.

28

1   Value Ratio exceeds 80%, the maximum debt-to-income ratios are 33% and 38% respectively."[15]

2   The Offering Materials for each of the securitizations at issue often had similar representations.[16]

3      212.   The representations regarding debt-to-income were untrue. Countrywide's

4   abandonment of its underwriting practices and coaching of borrowers regarding how to game the

5   system facilitated the widespread falsification of these statistics. In reality, a borrower's income

6   was regularly inflated. Countrywide failed to disclose that these statistics were baseless.

7      213.   The ratio of a borrower's debt to his or her income was material to Plaintiffs and

8   other investors because it represents a borrower's ability to afford the mortgage payments at issue,

9   and thus implicates the likelihood of default.

10   **E.**    **Defendants Materially Misrepresented the Accuracy**

11       **of the Credit Ratings Assigned to the Certificates**

12      214.   Defendants represented in the Offering Documents that all of the Certificates

13   purchased by Plaintiffs were worthy of being "rated in one of the highest rating categories of at

14   least one nationally recognized rating agency."[17] This rating would ostensibly signify that the risk

15   of loss was virtually non-existent.

16      215.   By providing ratings, Defendants represented that they believed that the information

17   provided to the rating agencies to support these ratings accurately reflected Countrywide's

18   underwriting guidelines and practices, and the specific qualities of the underlying loans. As stated

19   in detail above, ¶¶ 167-178, this representation was false. Defendants further represented in the

20   Prospectus Supplements, in sum or substance, that:

21         The ratings assigned . . . to mortgage pass-through Certificates

22         address the likelihood of the receipt of all distributions on the
            mortgage loans by the related certificateholders under the agreements

23         pursuant to which the Certificates are issued. S&P's ratings take into
            consideration the credit quality of the related mortgage pool,

24         including any credit support providers, structural and legal aspects

25   [15] *See* Prospectus Supplement for CWHL 2007-17 S-46.

26   [16] *See also* Prospectus Supplements for: CWHL 2006 OA5 S-73; CWHL2005-21 S-36; CWHL
      2007-18 S-40; CWALT 2005-51 S-72; and CWHL 2007-14 S-34.

27   [17] *See* Prospectus for CWALT 2005-51 p. 9; CWHL 2005-21 p. 13; CWHL 2006 –OAS p.11;

28   CWHL 2007-14 p.9; CWHL 2007-17 p. 9, CWHL 2007-18 p. 108 and Prospectus Supplement for
   BOAMS 2007-3 S-77.

associated with the Certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the Certificates.

216.    These statements regarding the ratings assigned to the Certificates were false because Defendants stated the assigned ratings while failing to disclose that misleading information was provided to the rating agencies by Countrywide and Bank of America to ensure AAA or otherwise investment grade ratings.

217.    The falsity of these statements is further evidenced by the downgrades of nearly all of the Certificates from AAA to junk status within a few years of issuance. *See* Exhibit 3.

**F.    Defendants Materially Misrepresented Countrywide's Transfer of Good Title to the Mortgage Loans to the Issuing Trusts**

218.    In sum or substance, the Countrywide Defendants stated in each Prospectus Supplement that:

> In addition, each of the sellers will represent and warrant that, prior to the sale of the related mortgage loans to the depositor, the applicable seller had good title to the mortgage loans sold by it. . . . Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the certificateholders.[18]

219.    These representations were false because, as alleged in detail in ¶¶ 179-189, Countrywide Servicing routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs. These representations were also false because Defendants routinely failed to execute valid endorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs. The issuing trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in case of default.

---

[18] *See* Prospectus Supplements CWALT 2005-51 S-20; CWHL 2005-21 S-14; CWHL 2006-OA5 S-33; CWHL 2007-14 S-26; CWHL 2007-17 S-36; and CWHL 2007-18 S-30.

### G. Misrepresentations Contained in Other Documents

220. In addition to the preliminary (*i.e.*, free writing) and final Prospectuses and Prospectus Supplements, Plaintiffs also relied on term sheets and computational materials which likewise contained material misrepresentations.

221. For example, with respect to CWALT 2005-51, the computational materials represented that: (a) the Offering had a "AAA" rating; (b) the weighted average original LTV ratio for group one and group two loans were 75% and 74%, respectively; (c) 80% of the homes in each loan group were owner-occupied; (d) the average credit score for group one loans was 710 and the average credit score for group two loans was 709; (e) the loans were underwritten according to Countrywide Home Loans' underwriting standards. The computational materials for the other Countrywide Certificates contained similar misrepresentations.

222. Plaintiffs were also provided with final term sheets for this Offering which contained false and misleading information regarding the FICO scores and LTV ratios for each loan group and represented that the Offering had a "AAA" rating. The final term sheets also made the same representations contained in the Prospectus Supplements with respect to occupancy types and documentation procedures.

223. Plaintiffs also received a term sheet from BOAS for the BOAMS 2007-3 Offering. It represented that the weighted average original LTV score was 70.69%; that 20.30% of the loans were originated pursuant to full documentation procedures; that the weighted average FICO score was 741; and that 98.87% of the properties were fully appraised as opposed to appraised by an AVM or Desktop model. As alleged in detail above, these representations were false and misleading.

### VII. BECAUSE OF DEFENDANTS' FRAUDULENT CONDUCT, PLAINTIFFS HAVE SUFFERED LOSSES ON THEIR PURCHASES OF CERTIFICATES

224. The ratings on all of the Certificates have since been downgraded from AAA to junk status by S&P and/or Moody's and they are no longer marketable at the prices paid for them by Plaintiffs. *See* attached Exhibit 3. Indeed, certain of the Certificates, CWHL 2006 OA5 2A3 and



1   CWALT 2005-513AB3, have lost virtually all of their value, and are worth as little as $0.01-$0.07

2   of par value.

3       225.   Further, the delinquency, bank ownership and foreclosure rates on the underlying

4   mortgages have soared since issuance. As reflected in the attached Exhibit 4, the average

5   percentage of loans that are currently 90+ days in delinquency, ranges from 10.91%- 59.36%.

6   Moreover, these current performance numbers do not reflect the number of loans which have been

7   foreclosed since issuance and which are no longer included within the loan pools. Exhibit 4 reflects

8   the original number of loans in the loan pools and the total number of loans which have been

9   removed from the pools, largely due to either foreclosure or early payout, negatively impacting the

10   income payable to investors in the Certificates.

11       226.   Statistical studies by others have similarly revealed that the problems in mortgage

12   loans were tied to the abandonment of underwriting standards. The F.B.I. Mortgage Fraud Reports

13   of 2007 (published in April 2008) reported on the results of a study of three million residential

14   mortgages that found that between 30% and 70% of early payment defaults were linked to

15   significant misrepresentations in the original loan applications. Loans containing egregious

16   misrepresentations like the misrepresentations documented in the Countrywide loan pools were five

17   times as likely to default in the first six months than loans that did not.

18       227.   Other parties' reviews of Countrywide's full loan files have revealed even greater

19   deviations. Third parties with access to the complete loan files for certain Countrywide

20   securitizations have performed additional analysis of the mortgage loans underlying Countrywide's

21   offerings. These include, among others, MBIA and Syncora. Their analyses provide additional

22   strong evidence that essential characteristics of the mortgage loans underlying Countrywide's MBS

23   were misrepresented and omitted material information, and that the problems in Countrywide's

24   underwriting practices were systemic.

25       228.   MBIA is a New York-based monoline insurer that wrote insurance on certain

26   Countrywide mortgage-backed securities offerings. MBIA conducted an investigation into

27   Countrywide's loan files after it was asked to make payments to certain other investors.

28

229. MBIA's analysis found that the defective loans span Countrywide's securitizations from 2004 to 2007, demonstrating the consistency of Countrywide's disregard for its own underwriting guidelines over this period, the same period at issue in this case. Because Countrywide's violation of its underwriting guidelines was a systemic problem, MBIA's findings are applicable to all of Plaintiffs' Certificates.

230. In carrying out its review of the approximately 19,000 Countrywide loan files, MBIA found that 91% of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines.

231. MBIA's report showed that the loan applications frequently "(i) lack key documentation, such as verification of borrower assets or income; (ii) include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower on the face of the application; or (iv) reflect that any of borrower income, FICO score, debt, DTI [debt-to-income,] or CLTV [combined loan-to-value] ratios, fails to meet stated Countrywide guidelines (without any permissible exception)."

232. Syncora, another insurance company that insured Countrywide's securitizations, has conducted a similar re-review analysis of defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's representations. Syncora found that 75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines, lack any compensating factors that could justify their increased risk, and should never have been made." Syncora's review is probative of the problems underlying Plaintiffs' Certificates because it again demonstrates that Countrywide's failures during this key period of 2004 to 2007 were systemic.

233. Syncora gave examples of individual loans that diverged from Countrywide's guidelines. The individual defective loans analyzed by Syncora reflected a long list of misstatements by Countrywide. Many loans violated the debt-to-income ratios and LTV ratios set forth in Countrywide's underwriting guidelines, without adequate compensating factors to justify the increased risk of default, due in part to borrowers' exaggerated incomes and exaggerated property values. Loan amounts routinely exceeded the maximum amounts permitted under the

1  Company's guidelines for each given borrower, based on a borrower's credit score, documentation,

2  and property values.  Countrywide also improperly issued loans to borrowers when their loan files

3  lacked adequate documentation of the borrowers' income, assets, credit, employment, cash

4  reserves, or property values.

5  **VIII. THE LIABILITY OF BANK OF AMERICA AS THE**

6  **SUCCESSOR-IN-INTEREST TO COUNTRYWIDE**

7      234.    As Countrywide's successor in liability, Bank of America is jointly and severally

8  liable for any and all damages resulting to Plaintiffs from the wrongful actions of Countrywide.

9  Bank of America itself has acknowledged that its acquisition of all of Countrywide's assets through

10  an all-stock transaction on July 1, 2008 was a "merger."  In a July 2008 press release, Barbara

11  Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses"

12  of Bank of America and Countrywide, said: "Now we begin to combine the two companies and

13  prepare to introduce our new name and way of operating."  According to Bank of America, it

14  "anticipates substantial cost savings from combining the two companies," from eliminating

15  employment positions, and from reducing overlapping technology, vendor and marketing expenses.

16  Desoer added that "the company is expected to benefit by leveraging its broad product set to deepen

17  relationships with existing Countrywide customers."  Desoer was also interviewed for the May

18  2009 issue of Housing Wire, which reported that one of the assets [Bank of America] acquired with

19  Countrywide was a vast technology platform for originating and servicing loans, and Desoer says

20  that the bank will be migrating some aspects of BofA's mortgage operations over to Countrywide's

21  platforms.  Desoer was quoted as saying, "[w]e're done with defining the target, and we're in the

22  middle of doing the development work to prepare us to be able to do the conversion of the part of

23  the portfolio going to the legacy Countrywide platforms."  Mozilo stated in another press release

24  that "the combination of Countrywide and Bank of America will create one of the most powerful

25  mortgage franchises in the world."  And in its 2008 Annual Report, Bank of America confirmed

26  that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and

27  servicing" and "as a combined company," it would be recognized as a "responsible lender who is

28  committed to helping our customers become successful homeowners."

235.    Bank of America has reported to the SEC that on November 7, 2008, Countrywide Financial and Countrywide Home "transferred substantially all of their assets and operations to [Bank of America]." This transfer of assets was "in connection with the integration of Countrywide Financial Corporation with [Bank of America's] other businesses and operations." A California federal court recently found that since the merger, "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009." And the New York Supreme Court has denied the defendants' motion to dismiss MBIA's and Syncora's successor and vicarious liability claims against Bank of America based on Countrywide MBS. Countrywide also ceased submitting filings to the SEC, which are now submitted as part of Bank of America's filings. Further, Bank of America has taken responsibility for Countrywide's pre-merger liabilities, including restructuring hundreds of thousands of loans created and serviced by Countrywide and paying billions of dollars in settlements.

236.    A spokesperson for Bank of America confirmed: "We bought the company and all of its assets and liabilities." Similarly, a January 23, 2009 New York Times article quoted Kenneth D. Lewis (who at the time was Bank of America's Chairman and CEO), acknowledging that Bank of America had factored Countrywide's liabilities into the price it paid to acquire Countrywide: "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price."

237.    Consistent with its assumption of Countrywide's liabilities, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide by state Attorneys General by agreeing to loan modifications for 390,000 borrowers, an agreement valued up to $8.4 billion. Bank of America also agreed to pay $150 million to help Countrywide customers who were already in or were at serious risk of foreclosure, and an additional $70 million to help Countrywide customers who had already lost their homes to make the transition to other living arrangements. In 2008, Bank of America restructured 300,000 home loans of which 87% had been originated or serviced by Countrywide. In announcing that its loan modification program, known as the National Homeowners Retention Program ("NHRP"), will now have a "principal forgiveness" component,

1 Bank of America noted that it "developed and launched the NHRP to provide assistance to

2 Countrywide borrowers."

3      238.   On January 3, 2011, Bank of America paid $2.8 billion to GSEs Freddie Mac and

4 Fannie Mac to settle claims of misrepresentations on billions of dollars in loans that went sour after

5 Fannie and Freddie bought them from Countrywide. In exchange for the payments, Freddie Mac

6 and Fannie Mae agreed to drop their demands that Bank of America buy back the mortgages. The

7 payment of $1.28 billion to Freddie Mac settled 787,000 loan claims (current and future) sold by

8 Countrywide through 2008. The payment of $1.34 billion (after applying credits to an agreed upon

9 settlement amount of $1.52 billion) to Fannie Mae settled repurchase claims on 12,045

10 Countrywide loans (with approximately $2.7 billion of unpaid principal balance) and other specific

11 claims on 5,760 Countrywide loans (nearly $1.3 billion of unpaid principal balance).

12      239.   Upon information and belief, Bank of America has been operating Countrywide

13 Home effectively as a division of Bank of America. To that end, on April 27, 2009, Bank of

14 America announced that "[t]he Countrywide brand has been retired." Bank of America advised that

15 it is operating the Countrywide home loan and mortgage business as a "division" named Bank of

16 America Home Loans, which "represents the combined operations of Bank of America's mortgage

17 and home equity business and Countrywide Home Loans." The Bank of America Home Loans

18 division is headquartered at Countrywide's offices in Calabasas, California.

19      240.   Further, Bank of America's website states that "Countrywide customers . . . have

20 access to Bank of America's 6,100 banking centers." Countrywide's former website redirects

21 customers to Bank of America's website.

22 **IX.    CAUSES OF ACTION FOR FRAUD**

23                           **FIRST CAUSE OF ACTION**

24                          **(Common Law Fraud)**

25      241.   Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs, as

26 if fully set forth herein.

27

28

242.  This First Cause of Action is brought against Sambol, Mozilo, Sieracki, the Countrywide Defendants, Bank of America Corp., Banc of America Mortgage Securities and BOAS (the "Common Law Fraud Defendants").

243.  The Common Law Fraud Defendants promoted and sold the Certificates purchased by Plaintiffs pursuant to defective Prospectuses, Prospectus Supplements, and related documents, including term sheets, pooling and servicing agreements, computational material, data regarding the LTV and debt-to-income ratios of the pools, and computer models of the financial structures of the securitizations. These documents contained fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

244.  Each of the Countrywide Defendants, Mozilo and Sambol were so closely connected that they can all be considered part of a common scheme whose purpose was to sell as many MBS as they could regardless of the risk to investors. The Countrywide Defendants have conceded, among other things, that it was corporate practice to abandon loan underwriting standards through matching techniques and the secret and unjustified use of exceptions.

245.  Pursuant to this scheme, Countrywide Home Loans underwrote the loans disregarding all underwriting standards and ignoring the requirement for independent appraisals. Countrywide Securities, knowing or recklessly disregarding these facts, packaged the loans into securities without disclosing the risky nature of these securities. Countrywide Financial, through Mozilo, Sambol, and Sieracki, was intricately involved in the issuance of, and disclosures relating to, the MBS Certificates. Mozilo, Sambol and Sieracki reviewed the Prospectuses and knowingly or recklessly disregarded the misstatements regarding the quality of the loans and the inflated appraisals, and profited from this scheme. Countrywide Servicing knew that the Prospectus Supplements misrepresented that good title to the mortgage loans would be transferred to the issuing trusts when in reality it was the common practice for the depositors to retain the original promissory notes and security instruments. Countrywide Capital Markets participated in this scheme through their control of Countrywide Servicing and Countrywide Securities. CWALT and CWMBS, which were controlled by Countrywide Financial and had many officers of Countrywide

1  Financial on their boards, filed the Prospectus Supplements containing the material

2  misrepresentations with the SEC.

3      246.    Bank of America and its subsidiaries pursued a common scheme to deceptively

4  market MBS to investors for financial gain. BOAS was the broker for the CWHL 2005-21

5  Offering, and both broker and underwriter for the CWHL 2007-14 and BOAMS 2007-3 Offerings.

6  BOAS, through its due diligence in investigation of Countrywide loans, was familiar with the poor

7  quality of loans in the MBS Offerings such as the CWHL 2007-14. As with Countrywide, Banc of

8  America Mortgage Securities loosened their underwriting standards, placing many high risk loans,

9  such as second mortgages, into the loan pools and securitized these loans so that they could be

10 resold to investors such as Plaintiffs. As it had done in the past with respect to the Countrywide

11 Offerings, BOAS knew or recklessly disregarded the poor quality of the underlying loans, despite

12 the many representations in the Offering Documents to the contrary.

13     247.    Banc of America Mortgage Securities served as both the loan underwriter and the

14 depositor for the BOAMS 2007-3 offering. Banc of America Mortgage Securities originated the

15 loans and therefore had to have had knowledge as to their quality. As the depositor, Banc of

16 America Mortgage Securities made statements in the Prospectus Supplements representing that

17 underwriting standards were followed, the properties were suitably appraised, that none of the loans

18 had an LTV ratio at origination of more than 95%, that the Certificates had AAA ratings, and that

19 good title was effectively transferred. Banc of America Mortgage Securities knew or recklessly

20 disregarded that these statements were materially false and misleading at the time they were made

21 because they were the same entity that originated these loans.

22     248.    The downgrade of the BOAMS Certificate to junk status and the large rates of

23 default and delinquency would not have occurred if the loan quality of the MBS had been as it was

24 represented to be. *See* Exhibit 4.

25     249.    Bank of America controlled the operations of Banc of America Mortgage Securities

26 through its 100% indirect ownership and common executives. Bank of America operated through

27 its wholly-owned subsidiary, Bank of America, N.A., which, in turn, wholly owned Banc of

28 America Mortgage Securities. Every Bank of America Corp. executive was also an executive for

1   Bank of America, N.A.  For example, Amy Woods Brinkley concurrently served as the Global Risk

2   Executive for Bank of America Corp. and a Director and Global Risk Executive for Bank of

3   America, N.A.  Similarly, Barbara J. Desoer served as the Global Technology and Operations

4   Executive for Bank of America Corp. and a Director and Global Technology and Operations

5   Executive for Bank of America, N.A.  Kent Lewis, who serves as the CEO, Chairman and President

6   of Bank of America Corp. was also the CEO, Chairman, President and a Director of Bank of

7   America, N.A.  Robert Caruso, the Senior Vice President of Bank of America N.A., also served as a

8   Director for Bank of America Mortgage Securities.

9       250.   As such, Bank of America Corp., Banc of America Mortgage Securities and BOAS

10  were an integrally connected with a common goal of increasing loan production by originating low-

11  quality risky loans which were then packaged into securities and sold to investors such as Plaintiffs

12  without disclosing the decline in quality.

13      251.   Brian T. Moynihan, the CEO and President of Bank of America Corp., in his

14  Testimony before the Federal Crisis Inquiry Commission, on January 13, 2010, admitted that Bank

15  of America granted mortgages to risky "low income borrowers."  He further testified about the

16  negative consequences which resulted from these loans:

17          That is not to say we at Bank of America made no mistakes. As
            borrowers sought to monetize the equity in their homes, we expanded
18          our position to become a leading provider of prime second mortgages.
            We assured that payment patterns for second mortgages would
19          mirror past payment patterns for first mortgages. Instead, as home
            values fell unexpectedly, second mortgages in many cases behaved
20          more like unsecured credit, and we suffered severe losses on these
            portfolios.
21
22      252.   Plaintiffs, who decided to purchase the Certificates after reviewing and relying upon

23  the misrepresentations contained in the Offering Documents and related documents described

24  above, would never have suspected the low quality of the loans underlying the MBS they

25  purchased.  As Plaintiffs were not given access to the loan files and therefore could not examine the

26  underwriting quality or servicing practices for the Mortgage Loans in the Securitizations on a loan-

27  by-loan basis, they were entirely reliant on the Common Law Fraud Defendants to provide accurate

28  information regarding the loans.

253. A July 12, 2011 article published by the New York Times entitled "Bank of America's Mortgage Deal Questioned" further underscores the inability of investors such as Plaintiffs to obtain and review loan files. Among the reasons cited by investors challenging the proposed $8.5 billion settlement with Bank of America was investors' inability to review loan files to assess how many mortgages in the pools did not conform to represented standards.

254. Each of the Common Law Fraud Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made.

255. Each of the Common Law Fraud Defendants made these materially misleading statements and omissions for the purpose of inducing the Plaintiffs to purchase the Certificates. Furthermore, these statements related to these Defendants' own acts and omissions.

256. The Common Law Fraud Defendants knew that Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents and other public representations, as described herein.

257. The Common Law Fraud Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions. The Common Law Fraud Defendants knew that Plaintiffs would rely upon their representations in the Plaintiffs' decisions to purchase the Certificates at the prices it paid, if at all.

258. It was only by making such representations that the Common Law Fraud Defendants were able to induce the Plaintiffs to buy the Certificates. Plaintiffs would not have purchased or otherwise acquired the Certificates but for the Common Law Fraud Defendants' fraudulent representations and omissions about the quality of the Certificates.

259. Plaintiffs justifiably, reasonably, and foreseeably relied on Common Law Fraud Defendants' representations and false statements regarding the quality of the Certificates.

260. As a result of the false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered substantial damages.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Fraud)

261. Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

262. This Second Cause of Action is brought against Sambol, Mozilo, Sieracki, the Countrywide Defendants (except for CWALT and CWMBS), Bank of America, Banc of America Mortgage Securities and BOAS (the "Aiding and Abetting Defendants") for providing the Common-Law Fraud Defendants with substantial assistance in perpetrating the fraud.

263. The Aiding and Abetting Defendants knew of the fraud perpetrated by the Common Law Fraud Defendants. As alleged in detail above, each of the Aiding and Abetting Defendants knew that the Certificates were not backed by high quality loans, were not underwritten according to the represented underwriting standards, and contained inflated appraisals. They also knew that good title to the mortgage loans underlying the Certificates was not conveyed to the issuing trusts. The Aiding and Abetting Defendants participated in those violations and had actual knowledge of these acts.

264. Furthermore, the Aiding and Abetting Defendants provided the Common-Law Fraud Defendants with substantial assistance in advancing the commission of the fraud. As alleged in detail above, each of the Aiding and Abetting Defendants participated in the violations of the represented underwriting and appraisal standards, made false public statements about mortgage loan underwriting and appraisal standards, provided false information about the mortgage loans underlying the Certificates to the credit rating agencies, provided false information for use in the Offering Documents, or participated in the failure to properly endorse and deliver the mortgage notes and security documents to the issuing trusts.

265. It was foreseeable to the Aiding and Abetting Defendants at the time they actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

266. As a direct and natural result of the fraud committed by the Common-Law Fraud Defendants and the knowing and active participation of the Aiding and Abetting Defendants, Plaintiffs have suffered substantial damages.

### THIRD CAUSE OF ACTION

#### (False Statement for the Purposes of Inducing the Purchase or Sale of a Security)

#### (Cal. Corporations Code §§ 25400(d), 25500)

267. Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

268. This Third Cause of Action is brought against Countrywide Securities, UBS, BOAS, CWALT, CWMBS and Banc of America Mortgage Securities. These Defendants committed a primary violation of Sections 25400(d) and 25500 of the California Corporations Code by inducing Plaintiffs to purchase the Certificates through their false statements. Countrywide Securities, UBS, BOAS, CWALT, CWMBS and Banc of America Mortgage Securities made statements which were, at the time and light of the circumstances under which they were made, false and misleading with respect to material facts or had reasonable grounds to believe were false and misleading.

269. Countrywide Securities, UBS, BOAS, CWALT, CWMBS and Banc of America Mortgage Securities made these materially misleading statements and omissions for the purpose of inducing the Plaintiffs to purchase the Certificate.

270. By virtue of the foregoing, Countrywide Securities, UBS, BOAS, CWALT, CWMBS and Banc of America Mortgage Securities violated section 25400(d) of the California Corporations Code and are liable to Plaintiffs pursuant to Section 25500 of the California Corporations Code.

### X. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT AND FOR NEGLIGENT MISREPRESENTATION

271. The following allegations are in effect a separate complaint. For the following claims there is no allegation of fraud, scienter or recklessness and Plaintiffs disclaim the allegations set forth in the First through Third Causes of Action. These claims, brought under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") and the common law, are based solely

1   on claims of strict liability and/or the absence of any affirmative defense based on the

2   reasonableness of the pertinent defendants' investigation into the true facts, or their breach of their

3   duty of due care.

4         272.   The Securities Act claims pertaining to the following six Countrywide Offerings:

5   CWALT 2005-51; CWHL 2005-21; CWHL 2006 OA5; CWHL 2007-14; CWHL 2007-17; and

6   CWHL 2007-18, are asserted against certain of the Countrywide and Underwriter Defendants. The

7   Bank of America Offering (BOAMS 2007-3) is not included in the Securities Act Claims but is

8   included in the negligent misrepresentation claims and against certain of the Bank of America

9   defendants.

10      **A.**    **Overview of the Securities Act Claims**

11         273.   From 2005 through 2007, Countrywide Securities underwrote numerous offerings of

12   Certificates which were purchased by Plaintiffs. *See* Exhibit 1. The Registration Statements and

13   Prospectuses that Countrywide Securities filed with the U.S. Securities and Exchange Commission

14   ("SEC") pursuant to these offerings contained untrue statements of material fact or omitted material

15   facts. For example, the Registration Statements and Prospectuses represented that: (a) the loans

16   packaged into the Certificates were underwritten pursuant to Countrywide's specific loan

17   origination guidelines; (b) Countrywide Home evaluated the prospective borrowers' credit standing

18   and repayment ability prior to approving any loan; (c) when Countrywide made an exception to its

19   stated underwriting guidelines, it did so on "a case-by-case basis" and only if "compensating

20   factors" justifying the exception were present; (d) almost every mortgaged property received an

21   independent appraisal which conformed to acceptable standards and formed the basis of its LTV

22   ratios, an important metric to MBS investors; (e) the loans selected for securitization were chosen

23   "in a manner [not] intended to affect the interests of the certificate holders adversely"; (f) the

24   "AAA" ratings assigned to the Certificates were accurate reflections of the Certificates' credit

25   quality; and (g) the Certificates' issuing trusts possessed good title to the underlying mortgages.

26   Each of these material representations was untrue when made.

27         274.   Plaintiffs purchased Certificates issued under or traceable to these Registration

28   Statements and Prospectuses.

275.   The Securities Act and negligent misrepresentation claims expressly disclaim any allegations of fraud or scienter and do not incorporate any of the allegations of scienter and fraud contained in ¶¶ 88-190.

**B.   Tolling of the Statute Of Limitations for the Securities Act Claims**

276.   Plaintiffs are members of the proposed classes in *Luther v. Countrywide Financial Corporation*, Superior Court for the State of California County of Los Angeles No. BC 380698, filed on November 11, 2007; and *Maine State Retirement System Countrywide Financial Corp., et al.*, 10-cv-00302-MRP (C.D. Cal.), filed January 14, 2010. The pendency of these actions has tolled the statute of limitations on causes of action alleged in this complaint.

277.   The *Luther* complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Among the seven Certificates that Plaintiffs invested in, one was included in the November 2007 *Luther* class action. *See* Exhibit 2.

278.   On June 12, 2008, a different securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust Countrywide Financial Corp.*, BC392571 (Cal. Super. Ct. 2008). Like *Luther*, this action also alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters, although *Washington State Plumbing* based its claims on different securitizations than those in *Luther*.

279.   The six Countrywide Certificates that Plaintiffs purchased were included in the June 12, 2008 *Washington State Plumbing* class action. *See* Exhibit 2.

280.   On September 9, 2008, the *Luther* complaint was amended to add the securitizations from *Washington State Plumbing* to the *Luther* class. The *Washington State Plumbing* action was consolidated with the original *Luther* action, and a consolidated and amended complaint was filed on October 16, 2008. Plaintiffs' Countrywide Certificates were included in the defined class in the *Luther/Washington State Plumbing* consolidated complaint with respect to investments in six Certificates.

281.   The consolidated *Luther* action was subsequently dismissed on jurisdictional grounds in January 2010 and re-filed that month as *Maine State Retirement System v. Countrywide Financial Corp.*, No. 10 Civ. 0302 (C.D. Cal. 2010). Plaintiffs were included in the defined class in

1    the *Maine State* complaint with respect to investments in the same Offerings in the

2    *Luther/Washington State Plumbing* consolidated complaint. *See* Exhibit 2.

3           282.    Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), all putative

4    class members are treated as if they filed their own individual actions until they either opt out or

5    until a certification decision excludes them. *Id.* at 255. As the Second Circuit stated in *In re*

6    *WorldCom Securities Litigation*, 496 F.3d 245, 255 (2d Cir. 2007): "[B]ecause Appellants were

7    members of a class asserted in a class action complaint, their limitations period was tolled under the

8    doctrine of *American Pipe* until such time as they ceased to be members of the asserted class,

9    notwithstanding that they also filed individual actions prior to the class certification decision."

10   *WorldCom*, 496 F.3d at 256.

11          283.    Plaintiffs were members of the putative class "asserted" in *Luther* and subsequent

12   class actions, and its 1933 Act claims are therefore timely pursuant to *American Pipe* and *In re*

13   *WorldCom*.

14          284.    Plaintiffs reasonably and justifiably relied on the named plaintiffs in these class

15   actions to protect their rights and they reasonably and justifiably relied on the class action tolling

16   doctrines of *American Pipe* and *WorldCom* to toll the statute of limitations and repose on its 1933

17   Act claims.

18          285.    Each of the Countrywide Defendants named herein was also a defendant in the

19   *Luther* or *Washington State Plumbing* class actions, for the same causes of action asserted herein.

20          286.    On November 4, 2010 the court in *Maine State* held that the named plaintiffs had

21   standing only with respect to the 81 of the offerings in which the named plaintiffs themselves

22   invested. *Maine State Retirement System v. Countrywide Financial Corp.*, 722 F. Supp. 2d 1157,

23   1166-67 (C.D. Cal. 2010). The court rejected the plaintiffs' contention that they could represent

24   class members who bought other Countrywide offerings if the offerings emanated from a common

25   registration statement. The net effect of the court's ruling is to narrow the *Maine State* class and to

26   exclude class members whose investments in Countrywide MBS do not overlap with those of the

27   named plaintiffs. *Id.* On May 5, 2011, the *Maine State* Court issued another order stating that the

28

1   plaintiffs only had standing to sue based on the traches they held. *Maine State Retirement System v.*

2   *Countrywide Financial Corp.* No. 2:10-cv-000302, slip op. at 12 (C.D. Cal. May 5, 2011).

3        287.   As a result of the court's rulings in *Maine State*, Plaintiffs were charged with

4   investigating the alleged misconduct of Countrywide, and, if warranted, filing an action to pursue

5   their individual claims under the 1933 Act, California Law and the Common Law.

6        288.   On June 29, 2011 Bank of America announced a proposed $8.5 billion settlement

7   with a group of more than 20 large investors in order to resolve claims relating to Bank of

8   America's obligation to repurchase loans that did not conform to the standards enumerated in the

9   Offering Documents. This proposed settlement is the largest settlement by a financial services firm

10   to date, exceeding the total profits of Bank of America since the onset of the financial crisis in

11   2008.

12        289.   On June 29, 2011 the Bank of New York Mellon filed a petition in the New York

13   State Supreme Court for approval of the settlement. *See in the Matter of the Application of the*

14   *Bank of New York Mellon,* 651786/2011. The settlement covers one or more offerings purchased

15   by Plaintiffs.

16        290.   On July 5, 2011 a group of investors called Walnut Place filed a petition seeking to

17   intervene in the court proceeding to challenge the settlement. According to Walnut Place, the

18   Countrywide Mortgage Loans in the 530 trusts currently have an unpaid principal balance of $221

19   billion. An additional $48 billion of loans have been liquidated from those trusts by foreclosure or

20   similar procedures. The total principal value Countrywide could be required to repurchase is

21   therefore $269 billion. Audits of Countrywide loan files, initiated by Walnut Place revealed that as

22   many as 90% of those loans breaches representations and warranties. According to Walnut Place,

23   Countrywide may be liable to repurchase loans with unpaid principal balances of as much as $242

24   billion.

25        291.   As detailed in the July 12, 2011 article published by the New York Times entitled

26   "Bank of America's Mortgage Deal Questioned," NY Attorney General, Eric Schneiderman, along

27   with a number of investors are challenging the proposed $8.5 billion settlement with Bank of

28

1  America due to their inability to adequately evaluate the settlement offer given that they do not

2  have access to the loan files and therefore cannot determine the number of nonconforming loans.

3      292.    Plaintiffs, like other investors, do not have access to the loan files underlying the

4  MBS they purchased.  However, due to the recently proposed Bank of America settlement

5  agreement and the recent press regarding the poor quality of the mortgages securing their

6  Certificates, Plaintiffs have brought this action against Bank of America and Countrywide.

7  Because of the uncertainty arising from the *Maine State* rulings, Plaintiffs have chosen to file this

8  separate action to assert its 1933 Act claims and other claims.

9      **C.    Defendants' Materially False Misstatements**

10         **and Omissions in the Offering Documents**

11     293.    The Offering Documents pursuant to which Plaintiffs purchased their Certificates

12  contained untrue statements of material fact, or omitted to state material facts necessary to make the

13  statements therein not misleading, regarding: (1) Countrywide Securities and Banc of America

14  Mortgage Securities' underwriting processes and guidelines by which the loans were originated; (2)

15  the requirements for obtaining a loan under the reduced documentation procedures and the

16  percentage of loans originated pursuant to full documentation procedures; (3) the value of the

17  underlying real estate securing the loans, in terms of LTV ratios and the appraisal standards by

18  which such real estate values were measured; (4) the debt-to-income ratios for each loan group in

19  the underlying loan pool; (5) the credit ratings of the Securities; and (6) the adequacy of

20  Countrywide's transfer of good title and legal ownership of the underlying loans to the issuing

21  trusts.

22         **1.    Defendants' False and Misleading Statements**

23            **Regarding Underwriting Guidelines**

24     294.    Countrywide Home Loans originated and/or packaged the mortgage loans that were

25  included in the pools for six of the Certificates.  The Prospectus Supplements for these Certificates

26  all contained identical or materially similar statements of material fact regarding Countrywide's

27  underwriting standards and practices.  Five out of the six Countrywide Prospectus Supplements

28

1  made the following misrepresentations regarding Countrywide's underwriting guidelines and

2  practices:

3      All of the mortgage loans in the trust fund will have been originated
   or acquired by Countrywide Home Loans in accordance with its
   credit, appraisal and underwriting standards.  Countrywide Home

4  Loans' underwriting standards are applied in accordance with
   applicable federal and state laws and regulations.  Except as

5  otherwise provided in this prospectus supplement, the underwriting
   procedures are consistent with those identified under "Mortgage Loan

6  Program—Underwriting Process" in the prospectus.[19]

7      295.   The remaining Prospectus Supplement (CWHL-2007-18) issued by CWMBS made

8  the following material misrepresentations:

9      Countrywide Home Loans' underwriting standards are applied by or
   on behalf of Countrywide Home Loans to evaluate the prospective

10  borrower's credit standing and repayment ability and the value and
   adequacy of the mortgaged property as collateral.  Under those

11  standards, a prospective borrower must generally demonstrate that the
   ratio of the borrower's monthly housing expenses (including principal

12  and interest on the proposed mortgage loan and, as applicable, the
   related monthly portion of property taxes, hazard insurance and

13  mortgage insurance) to the borrower's monthly gross income and the
   ratio of total monthly debt to the monthly gross income (the "debt-to-

14  income" ratios) are within acceptable limits.  The maximum
   acceptable debt-to-income ratio, which is determined on a loan-by-

15  loan basis varies depending on a number of underwriting criteria,
   including the Loan-to-Value Ratio, loan purpose, loan amount and

16  credit history of the borrower. In addition to meeting the debt-to-
   income ratio guidelines, each prospective borrower is required to

17  have sufficient cash resources to pay the down payment and closing
   costs.

18      296.   The Bank of America Prospectus similarly misrepresented that their underwriting

19  standards were adhered to:

20      The Mortgage Loans have been underwritten materially in accordance
   with one or more of the following: (i) Bank of America's general

21  underwriting standards . . . (ii) Bank of America's alternative
   underwriting standards . . . the underwriting standards used by

22  mortgage loan originators are intended to evaluate the mortgagor's
   credit standing and repayment ability and the value and adequacy of

23  the mortgaged property as collateral.[20]

24

25

26

---

27  [19]  *See* Prospectus Supplements: CWALT 2005-51 S-69, CWHL 2005-21 S-34; CWHL 2006-OA5
   S-71; CWHL 2007-14 S-32; and CWHL 2007-17 S-44.

28  [20]  *See* Prospectus for GSAMS 2007-3 p. 28.

297.   All of the Countrywide Prospectus Supplements represented that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."[21]

298.   Similarly, the Bank of America Prospectus represented that Bank of America would make exceptions to the underwriting guidelines.

> Bank of America permits ratios to exceed guideline when the applicant has documented compensating factors such as documented excess funds in reserves after closing, a history of making similarly sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income.[22]

299.   Additionally, all of the Countrywide Prospectus Supplements represented that "Countrywide Home Loans will represent and warrant to the depositor in the pooling and servicing agreement [that]. . . the selection was not made in a manner intended to affect the interests of the certificateholders adversely."[23]

300.   The above statements of material facts were untrue when made because Countrywide Securities and Banc of America Mortgage Securities failed to disclose that they: (a) systematically failed to follow its stated underwriting standards and ignored borrowers' repayment ability; (b) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (c) disregarded credit quality in favor of generating increased loan volume for securitizations; and (d) routinely allowed fraudulent representations of an applicant's stated income and, in many cases, knowingly falsified the stated income.

301.   Moreover, Defendants routinely acted adversely to the interests of Plaintiffs and other Certificate holders by knowingly selecting risky loans for the Certificates while "cherry picking" the best loans for Countrywide's own portfolio.

[21] See Prospectus Supplements: CWALT 2005-51 S-70; CWHL 2005-21 S-35; CWHL 2006-OA5 S-72; CWHL 2007-14 S-33; CWHL 2007-17 S-45; and CWHL 2007-18 S-38.

[22] See BOAMS 2007-3 Prospectus p. 31.

[23] See Prospectus Supplements: CWALT 2005-51 S-21; CWHL 2005-21 S-14; CWHL 2006-OA5 S-33; CWHL 2007-14 S-26; CWHL 2007-17 S-37; and CWHL 2007-18 S-30.

302.   In veering from their stated underwriting guidelines Countrywide, as described, disregarded borrowers' repayment ability by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting "stated income" loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualified borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exception to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that was meant to weed out non-qualifying loans and nonetheless approving such loans.

    2.   **Defendants' False and Misleading Statements**

        **Regarding the Standards for Obtaining a Loan under**

        **the Reduced Documentation Programs and the Percentage of**

        **Loans Granted Pursuant to Full-Documentation Procedures**

303.   The CWALT Offering Document at issue here (CWALT 2005-51) detailed the four programs that Countrywide offered where less than full borrower documentation of income, assets and employment were required, but in all instances credit scores had to be obtained, any deficiencies or derogations fully explained to the loan officers and, except for the Streamlined Documentation Program which had limited application, independent appraisals of the mortgage properties obtained—with all appraisals conforming to Fannie Mae and Freddie Mac standards.[24]

---

[24]  *See* Prospectus Supplement for CWALT 2005-51 S70-71.

304.   However, measures designed to evaluate the repayment ability of the borrowers who originated loans pursuant to the reduced documentation programs were regularly disregarded. Defendants' statement contained in each Prospectus Supplement that a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan, was materially false.[25] Countrywide failed to disclose that they had implemented reduced documentation programs designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage.

305.   Furthermore, each prospectus supplement contained detailed statistical information regarding the percentage of mortgages underwritten pursuant to full documentation procedures. For example, in the CWHL-2006 OA5 Offering, the Prospectus Supplement stated that "as of the cut-off date, none of the Mortgage Loans have been underwritten pursuant to Countrywide Home Loans' Preferred Processing Program" (a reduced documentation program where the loan applicant only had to give Countrywide the right to obtain their tax returns from the preceding two years and other documentation required under the program could be waived). The Prospectus Supplement further provided that of the 3,337 mortgage loans, 7 were originated under the CLUES program, 448 were originated under the Stated Income program, 436 were originated under the Full or Alternative Documentation program and 2,446 were originated under the Reduced Documentation program.[26]

306.   As mentioned in detail above, the use of reduced documentation programs was far more prevalent than what was disclosed in the relevant Prospectus Supplements, despite the fact that the Defendants knew that the loans originated pursuant to these programs were much more likely to default.

---

[25] *See* Prospectus Supplement CWALT 2005-51 S-70; CWHL 2005-21 S-35; CWHL 2006-OA5 S-72; CWHL 2007-14 S-33; CWHL 2007-17 S-45; and CWHL 2007-18 S-38.

[26] *See* Prospectus Supplement for CWHL 2006 OA5 S-12, S-40, S-51 and S-62.; *see also* CWHL 2007-17 S-44; CWHL 2005-21 S-20 and S-27; CWHL 2007-18 S-38; S-32, S-42, S-52 and S-62.

307.    Reduced documentation loans are riskier because the borrower provides less substantiating information for items such as his or her income or assets.  With less confirmation, it is more likely that there are errors or misrepresentations in the loan files.  Whether the information in a loan file was fully documented, or whether it was instead approved pursuant to a no-documentation or reduced documentation program (such as the "Preferred Processing Program"), was, therefore, material to Plaintiffs.

3.    Defendants' Untrue Statements and
Omissions Regarding Appraisals and LTV Ratios

308.    The Registration Statements also represented that in determining the adequacy of the property to be used as collateral, an appraisal would be made of each property considered for financing.  The Countrywide Prospectus Supplements represented that *independent* appraisals were prepared for each mortgaged property and that reports were prepared to substantiate these appraisals.  For example, all of the Prospectus Supplements for the Countrywide Certificates contained the following representation:

> Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans . . . . The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.[27]

309.    Similarly, the Prospectus for the Bank of America Certificate similarly represented that the mortgage properties would be appraised:

> Bank of America conducts a valuation of the mortgaged property as collateral for each mortgage loan. This collateral valuation may be determined by (i) an interior inspection (ii) a tax assessed value (iii) a desktop appraisal (iv) a drive-by appraisal (v) an automated valuation model (vi) reference to the collateral valuation obtained in connection with the origination of the previous loan if the loan is a refinance of a mortgage loan that was previously serviced by Bank of America.[28]

---

[27] *See* Prospectus Supplements: CWALT 2005-51 S-71; CWHL 2005-21 S-35; CWHL 2006-OA5 S-71; CWHL 2007-14 S-33; CWHL 2007-17 S-45; and CWHL 2007-18 S-39.

[28] *See* Prospectus for BOAMS 2007-3 p. 33-34.

310. Both the Countrywide and the Bank of America Prospectus Supplements provided detailed information regarding LTV ratios, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.

311. The Prospectus Supplements for CWHL 20051-21, CWHL 2006-OA5, and BOAMS 2007-3 stated that "[n]o Initial Mortgage Loans had a Loan-to-Value Ratio at origination or on the closing date of more than 95.00%."[29]

312. The remaining CWMBS and CWALT Prospectus Supplements stated that "[n]o Initial Mortgage Loans had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%."[30]

313. The representations regarding appraisals and LTV ratios were materially false and misleading in that they omitted to state that the appraisals were inaccurate because: (a) the appraisers were not independent from Countrywide, which exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values; (b) the appraisers often did not engage in a meaningful inspection , but rather engaged in a "drive by," (c) the actual LTV ratios for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser as represented in the Offering Documents; and (d) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated.

4. **Defendants Misrepresented the Maximum Debt-to-Income Ratio Allowed for Pursuant to the Underwriting Guidelines**

314. In the Offering Documents for CWHL 2007-17, for example, Countrywide represented that "under its underwriting guidelines Countrywide generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt to income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-

---

[29] *See* Prospectus Supplement CWHL 2005-21 S-17; CWHL 2006-OA5 S- 36 and BOAMS 2007-3 S-36.

[30] *See* Prospectus Supplement CWALT 2005-51 S-24; CWHL 2007-14 S-27; CWHL 2007-17 S-38 and CWHL 2007-18 S-32.

COMPLAINT

1   Value Ratio exceeds 80%, the maximum debt-to-income ratios are 33% and 38% respectively."[31]

2   The Offering Materials for each of the securitizations at issue had similar representations.[32]

3       315.   The representations regarding debt-to-income were untrue. Countrywide's

4   abandonment of its underwriting practices and coaching of borrowers regarding how to game the

5   system facilitated the widespread falsification of these statistics. In reality, a borrower's income

6   was regularly inflated. Countrywide failed to disclose that these statistics were baseless.

7       316.   The ratio of a borrower's debt to his or her income was material to Plaintiffs and

8   other investors because it represents a borrower's ability to afford the mortgage payments at issue,

9   and thus implicates the likelihood of default.

10       **5.    Defendants Materially Misrepresented the Accuracy**

11          **of the Credit Ratings Assigned to the Certificates**

12       317.   Defendants represented in the Offering Documents that all of the Certificates

13   purchased by Plaintiffs were worthy of being "rated in one of the highest rating categories of at

14   least one nationally recognized rating agency."[33] This rating would ostensibly signify that the risk

15   of loss was virtually non-existent.

16       318.   By providing ratings, Defendants represented that they believed that the information

17   provided to the rating agencies to support these ratings accurately reflected Countrywide's

18   creditworthiness based upon its underwriting guidelines and practices, and the specific qualities of

19   the underlying loan, when they knew that was not the case. Defendants further represented in the

20   Prospectus Supplements, in sum or substance, that:

21            The ratings assigned . . . to mortgage pass-through Certificates
22            address the likelihood of the receipt of all distributions on the
            mortgage loans by the related certificateholders under the agreements
23            pursuant to which the Certificates are issued. S&P's ratings take into
            consideration the credit quality of the related mortgage pool,
24            including any credit support providers, structural and legal aspects

25

26   [31]   *See* Prospectus Supplement for CWHL 2007-17 S-46.

     [32]   *See also* Prospectus Supplements for: CWHL 2006 OA5 S-73; CWHL 2005-21 S-36; CWHL
27   2007-18 S-40; CWALT 2005-51 S-72; CWHL 2007-14 S-34.

     [33]   *See* Prospectus for CWALT 2005-51 p. 9; CWHL 2005-21 p. 10; CWHL 2006 –OA5 p.11;
28   CWHL 2007-14 p.9; CWHL 2007-17 p.9; and CWHL 2007-18 p. 108.

associated with the Certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the Certificates.

319.   These statements regarding the ratings assigned to the Certificates were false because Defendants stated the assigned ratings while knowing that misleading information was provided to the rating agencies by Countrywide to ensure AAA or otherwise investment grade ratings.

320.   The falsity of these statements is further evidenced by the rapid downgrades of nearly all of the Certificates within a few years of issuance, with all of the Certificates downgraded to junk. *See* Exhibit 3.

6.   **Defendants Materially Misrepresented Countrywide's Transfer
     Good Title to the Mortgage Loans to the Issuing Trusts**

321.   In sum or substance, Defendants stated in each Prospectus Supplement that:

> In addition, each of the sellers will represent and warrant that, prior to the sale of the related mortgage loans to the depositor, the applicable seller had good title to the mortgage loans sold by it. . . . Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the certificateholders.[34]

322.   These representations were false because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs. These representations were also false because Defendants routinely failed to execute valid endorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs. The issuing trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in case of default.

---

[34] *See* Prospectus Supplements CWALT 2005-51 S-20; CWHL 2005-21 S-14; CWHL 2006- OA5 S-33; CWHL 2007-1 S-26; CWHL 2007-17 S-36; and CWHL 2007-18 S-30.

## FIFTH CAUSE OF ACTION

### (Violation of Section 11 of the Securities Act)

323. Plaintiffs repeat and re-allege each and every allegation above as if set forth in full herein, except any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly.

324. This Fifth Cause of Action is based solely upon Defendants' strict liability or negligence under the 1933 Act for making false and misleading statements in the Offering Documents for the sale of the Countrywide Certificates.

325. This Fifth Cause of Action is brought pursuant to Section 11 of the 1933 Securities Act, 15 U.S.C. § 77k ("Section 11"), against CWALT, CWMBS, the Underwriter Defendants, and the Signatory Defendants who signed the Registration Statements (together, the "Section 11 Defendants") arising from Plaintiffs' purchases of the six Countrywide Certificates.

326. Each of Plaintiffs' purchases of the Certificates was made pursuant to the false and misleading Offering Materials, including the Registration Statements.

327. The Offering Materials for the offerings were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein. At the time Plaintiffs obtained the Certificates, they did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

328. The Section 11 Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the offering materials, and/or participated in the issuance and dissemination to Plaintiffs of materially untrue statements of facts and omissions of material facts, which were contained in the Prospectuses.

329. The Section 11 Defendants are strictly liable to Plaintiffs for making the misstatements and omissions in issuing the Certificates under Section 11.

330. The Depositor Defendants are liable as issuers of the Certificates, in particular, within the meaning of Section 2(a)(4) of the 1933 Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a) of the 1933 Act, 15 U.S.C. § 77k(a).

331.   The Signatory Defendants are liable as signatories for signing the Registration Statements in accordance with Section 11(a)(1) of the 1933 Act, 15 U.S.C. § 77k(a)(1).

332.   The Underwriter Defendants are liable for their roles as underwriters in the sale of the Certificates under Section 11(a)(5) of the 1933 Act, 15 U.S.C. § 77k(a)(5).  Underwriter Defendants directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

333.   The Section 11 Defendants owed to the Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

334.   The Section 11 Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and that there was no omission of material facts necessary to make the statements contained therein not misleading.

335.   The Section 11 Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectuses, which made false and misleading statements and misrepresented or failed to disclose material facts, as set forth above.

336.   By reason of the conduct alleged herein, the Section 11 Defendants violated Section 11 of the 1933 Securities Act, and are liable to Plaintiffs.

337.   By virtue of the foregoing, Plaintiffs are entitled to damages, jointly and severally from each of the Section 11 Defendants.

# SIXTH CAUSE OF ACTION

## (Violation Of Section 12(a)(2) of the Securities Act)

338. Plaintiffs repeat and re-allege each and every allegation above as if set forth in full herein, except any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly.

339. This Sixth Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs, against Countrywide Securities, UBS, BOAS, CWALT and CWMBS with respect to the Countrywide Certificates and is based solely on strict liability or negligence.

340. This Sixth Cause of Action relates to all Countrywide Certificates except the CWHL 2005-21 Certificate which was purchased in the secondary market.

341. Countrywide Securities, UBS, BOAS, CWALT and CWMBS promoted and sold the Countrywide Certificates pursuant to the defective Prospectuses for their own financial gain. Specifically, Countrywide Securities, UBS, BOAS, CWALT and CWMBS sold the Certificates to Plaintiffs and profited on these transactions.

342. Countrywide Securities, UBS, BOAS, CWALT and CWMBS are liable to Plaintiffs for the sale of the Countrywide Certificates that they sold directly to Plaintiffs. These Defendants hold title to and/or participated in the planning and pricing of each Certificate, participated in the drafting of each Prospectus and Prospectus Supplement, and served as the brokers for one or more of these offerings.

343. Countrywide Securities, UBS, BOAS, CWALT and CWMBS owed to Plaintiffs a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading. Countrywide Securities, UBS, BOAS, CWALT and CWMBS knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

344. Plaintiffs purchased or otherwise acquired Certificates pursuant to the defective Prospectuses. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

345. By reason of the conduct alleged herein, Countrywide Securities, UBS, BOAS, CWALT and CWMBS violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiffs.

346. Plaintiffs were damaged by Countrywide Securities, UBS, BOAS, CWALT and CWMBS's wrongful conduct. As to Certificates which Plaintiffs still hold, they have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act. As to Certificates which Plaintiffs has sold, they are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

## SEVENTH CAUSE OF ACTION

### (Violation of Section 15 of the Securities Act)

347. Plaintiffs repeat and re-allege each and every allegation above as if set forth in full herein, except any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly.

348. This Seventh Cause of Action is brought under Section 15 of the 1933 Act, 15 U.S.C. § 77o ("Section 15") against Sambol, Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets Countrywide Securities and the Signatory Defendants (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of action set forth above.

349. Many members of the Board concurrently held positions on both Countrywide Financial or Countrywide Home and CWALT and CWMBS. For example, Defendant Kurland, who was the CEO and president of CWALT and CWMBS was also simultaneously the Executive Vice President and COO of Countrywide Financial. Similarly, Defendant Spector who was a member of the Board of directors for CWALT and CWMBS was concurrently the Senior Managing Director of Countrywide Financial. Defendant Sieracki the Executive Vice President, CFO and Treasurer and member of the Board of Directors for CWALT and CWMBS was also the Executive Vice President and CFO of Countrywide Financial. Likewise, Defendant Sandefur was a member of the Board of Directors for CWALT and CWMBS and also the Senior Managing Director and treasurer of Countrywide Home.

350.     As such, each of the Section 15 Defendants had actual power over, control of and ownership of the Section 11 Defendants, defined above, at the time of the wrongs alleged herein, including control over the content of the Offering Materials and exercised that power and influence, *inter alia*, to cause the Section 11 Defendants to engage in violations of the Securities Act, as described herein.  The Section 15 Defendants' control, ownership and positions made them privy to the material facts concealed from Plaintiffs.  The Section 15 Defendants are controlling persons within the meaning of Section 15.

351.     None of the Section 15 Defendants, named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omissions of any material fact, or were not misleading.

352.     Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

353.     By virtue of the wrongful conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with—and to the same extent as— the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

### EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### (Pursuant to Cal. Civil Code §§ 1572 *et seq.*, 1709 *et seq.* and Common Law)

354.     Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein, except any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, Plaintiffs expressly disclaims any claim of fraud or intentional misconduct.

355.     This Eighth Cause of Action is a claim for negligent misrepresentation against Sambol, Mozilo, Sieracki, the Countrywide Defendants, Bank of America Corp., Banc of America Mortgage Securities and Bank of America Securities (the "Negligent Misrepresentation Defendants").

356.　Plaintiffs made seven investments in Certificates that the Countrywide or Bank of America Defendants securitized and sold. The Negligent Misrepresentation Defendants also originated or acquired, underwrote, and serviced all the loans in the Offerings. Mozilo, Sambol, and Sieracki were closely involved in the everyday management of the other Negligent Misrepresentation Defendants.

357.　Because the Negligent Misrepresentation Defendants arranged the securitization of the mortgage loans, and originated or acquired, underwrote, and serviced all of the underlying mortgage loans, they had unique and special knowledge about the loans in the Offerings. In particular, the Negligent Misrepresentation Defendants had unique and special knowledge and expertise regarding the quality of the underwriting of those loans as well as the servicing practices employed as to such loans.

358.　Because Plaintiffs could not evaluate the loan files for the mortgage loans underlying their Certificates, and because Plaintiffs could not examine the underwriting quality or servicing practices for the Mortgage Loans in the Securitizations on a loan-by-loan basis, it relied on the Negligent Misrepresentation Defendants' unique and special knowledge regarding the underlying mortgage loans when determining whether to make each investment of Certificates. Plaintiffs were entirely reliant on the Negligent Misrepresentation Defendants to provide accurate information regarding the loans in engaging in that analysis. Accordingly, the Negligent Misrepresentation Defendants were uniquely situated to evaluate the economics of each Certificate.

359.　A July 12, 2011 article published by the New York Times entitled "Bank of America's Mortgage Deal Questioned" further underscores the inability of investors such as Plaintiffs to obtain and review loan files. Among the reasons cited by investors challenging the proposed $8.5 billion settlement with Bank of America was investors' inability to review loan files to assess how many mortgages in the pools did not conform to represented standards.

360.　Over the course of more than two years, for seven separate investments, Plaintiffs relied on the Negligent Misrepresentation Defendants' unique and special knowledge regarding the quality of the underlying mortgage loans and their underwriting when determining whether to invest in the Offerings. This longstanding relationship, coupled with the Negligent

1    Misrepresentation Defendants' unique and special knowledge about the underlying loans, created a

2    special relationship of trust, confidence, and dependence between the Negligent Misrepresentation

3    Defendants and Plaintiffs.

4        361.    The Negligent Misrepresentation Defendants were aware that Plaintiffs relied on

5    their unique and special expertise and experience and depended upon them for accurate and truthful

6    information. The Negligent Misrepresentation Defendants also knew that the facts regarding

7    Countrywide's compliance with its underwriting standards were exclusively within their

8    knowledge.

9        362.    Based on their expertise, superior knowledge, and relationship with Plaintiffs, the

10   Negligent Misrepresentation Defendants owed a duty to Plaintiffs to provide complete, accurate,

11   and timely information regarding the mortgage loans and the Certificates. The Negligent

12   Misrepresentation Defendants breached their duty to provide such information to Plaintiffs.

13       363.    The Negligent Misrepresentation Defendants likewise made misrepresentations

14   which they knew, or should have known were false and misleading, in order to induce Plaintiffs'

15   investment in the Certificates. The Negligent Misrepresentation Defendants provided the Offering

16   Documents and related materials to Plaintiffs in connection with the Certificates, for the purpose of

17   informing Plaintiffs of material facts necessary to make an informed judgment about whether to

18   purchase the Certificates in the Offerings. In providing these documents, the Negligent

19   Misrepresentation Defendants knew that the information contained and incorporated therein would

20   be used for a serious purpose, and that Plaintiffs, like other reasonably prudent investors, intended

21   to rely on the information.

22       364.    As alleged above, the Offering Documents and related materials provided to

23   Plaintiffs relating to the Certificates contained materially false and misleading information.

24       365.    The Negligent Misrepresentation Defendants should have known that the

25   information in the Offering Documents was materially false and misleading.

26       366.    Unaware that the Offering Documents contained materially false and misleading

27   statements, Plaintiffs reasonably relied on those false and misleading statements when deciding to

28   purchase the non-secondary Certificates in the Offerings.

367. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

### NINTH CAUSE OF ACTION

#### (Untrue or Misleading Statements in the Sale of Securities)

#### (Cal. Corporations Code §§ 25401, 25501, 25504)

368. This Ninth Cause of Action is brought against Sambol, Mozilo, Sieracki, the Countrywide Defendants, Bank of America Corp., Banc of America Mortgage Securities and BOAS. Each of these Defendants committed a primary violation of Sections 25401 and 25501 of the California Corporations Code in selling the Certificates to Plaintiff by means of the Offering Documents, which contained untrue statements of material fact necessary in order to make the statements in the Offering Documents not misleading.

369. Each of Sambol, Mozilo, Sieracki, the Countrywide Defendants, Bank of America Corp., Banc of America Mortgage Securities, and BOAS is liable under Section 25504 of the California Corporations Code because it directly and/or indirectly controlled the Depositor Defendants by virtue of its ownership, offices, directorship, and specific acts at the time of the wrongs alleged herein in violation of Sections 25401 and 25501.

370. Additionally, each of the Individual Defendants and Sambol is liable under Section 25504 as a principal executive officer or director of the Depositor Defendants at the time of their violation of Section 25401 and 25501.

### TENTH CAUSE OF ACTION

#### (Successor and Vicarious Liability)

371. Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

372. Bank of America Corp., BAC Home Loans Servicing, and NB Holdings are jointly and severally liable for any and all damages resulting from the wrongful actions of Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and Countrywide Capital Markets, as alleged herein, because it is the successor-in-interest to Countrywide Financial and is vicariously liable for the conduct of Countrywide Financial,

1 Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and Countrywide
2 Capital Markets as a result of a de facto merger of the two entities.

3    373.   This acquisition was a de facto merger because Bank of America intended to take
4 over and effectively took over Countrywide Financial and its subsidiaries in their entirety and, thus,
5 should carry the liabilities of Countrywide Financial, Countrywide Home Loans, Countrywide
6 Securities, Countrywide Servicing, and Countrywide Capital Markets as a concomitant to the
7 benefits it derived from the purchase.

8    374.   The acquisition resulted in continuity of ownership—a hallmark of a de facto
9 merger—because the shareholders of Countrywide Financial became shareholders of Bank of
10 America as a result of Bank of America's acquisition of Countrywide Financial on July 1, 2008
11 through an all-stock transaction involving a wholly-owned Bank of America subsidiary that was
12 created for the sole purpose of facilitating the acquisition of Countrywide Financial. Bank of
13 America has described the transaction as a merger, and has actively incorporated the Countrywide's
14 mortgage business into Bank of America.

15    375.   Bank of America assumed the liabilities ordinarily necessary for the uninterrupted
16 continuation of the business of Countrywide Financial, Countrywide Home Loans, Countrywide
17 Securities, Countrywide Servicing, and Countrywide Capital Markets—another hallmark of a de
18 facto merger. Among other things, the Countrywide brand has been retired and the old
19 Countrywide website redirects customers to the mortgage and home loan sections of Bank of
20 America's website. On April 27, 2009, Bank of America announced that "[t]he Countrywide brand
21 has been retired." Instead, Bank of America operated its home loan and mortgage business through
22 a new division named Bank of America Home Loans, which "represents the combined operations
23 of Bank of America's mortgage and home equity business and Countrywide Home Loans." The
24 integration of Countrywide Financial, Countrywide Home Loans, Countrywide Securities,
25 Countrywide Servicing, and Countrywide Capital Markets into Bank of America is complete.

26    376.   The ordinary business of Countrywide Financial was ceased and the Company
27 dissolved soon after the acquisition—another hallmark of a de facto merger. On November 7,
28 2008, Bank of America acquired substantially all of the assets of Countrywide Financial. And, at

1   that time, Countrywide Financial ceased submitting filings to the SEC; Countrywide Financial's

2   assets and liabilities are now included in Bank of America's filings.

3        377.    Bank of America has also taken responsibility for the pre-merger liabilities of

4   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, Countrywide

5   Servicing, and Countrywide Capital Markets, including restructuring hundreds of thousands of

6   loans created and serviced by these Defendants. As a spokesperson for Bank of America admitted:

7   "We bought the company and all of its assets and liabilities."

8        378.    Because Bank of America has merged with Countrywide Financial, and acquired

9   substantially all of the assets of Countrywide Home Loans, Countrywide Securities, Countrywide

10  Servicing and Countrywide Capital Markets, through BAC Home Loans Servicing, NB Holdings

11  and others, the Bank of America Defendants are the successors in liability to Countrywide

12  Financial, Countrywide Home Loans, Countrywide Securities, Countrywide Servicing, and

13  Countrywide Capital Markets, and are jointly and severally or otherwise vicariously liable for the

14  wrongful conduct, as alleged herein, of these Defendants.

15                                                **PRAYER FOR RELIEF**

16      WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

17      A.    Awarding compensatory and/or rescissionary damages in favor of Plaintiffs against

18  all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

19  wrongdoing, in an amount to be proven at trial, including interest thereon;

20      B.    Awarding punitive damages for Plaintiffs' common-law fraud claims;

21      C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

22  including counsel fees and expert fees; and

23      D.    Such other relief as the Court may deem just and proper.

24  ///

25  ///

26  ///

27  ///

28  ///

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable as a matter of right.

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER

LOWEY DANNENBERG COHEN & HART, P.C.
STEPHEN LOWEY
BARBARA HART
DAVID HARRISON

By _____
Maxwell M. Blecher
Attorneys for Plaintiffs

#47234

99
COMPLAINT

11/787/22

## EXHIBIT 1: FEDERATED COUNTRYWIDE AND BANK OF AMERICA SECURITIES

| Name of Security | Date of Registration Statement and Filing Number | Signatories of Registration Statement | Date of Prospectus | Name of Issuer | Name of Depositor | Underwriters of Securities | Loan Underwriters |
|---|---|---|---|---|---|---|---|
| CWALT 2005-51 3AB3 | File No. 333-125902 Original: 6/17/2005 Amended: 7/25/2005 | Standford Kurland Eric Sieracki David Spector | 7/25/2005 | Alternative Loan Trust 2005-51 | CWALT, Inc. | Countrywide Securities Corporation | Countrywide Home Loans; Mortgage IT, Inc. |
| CWHL 2005-21 A2 | File No: 333-125963 Original: 6/20/2005 Amended: 7/25/2005 | Standford Kurland Eric Sieracki David Spector | 7/25/2005 | CHL Mortgage Pass-Through Trust 2005-21 | CWMBS, Inc. | Greenwich Capital Markets, Inc.; UBS Securities LLC; Morgan Stanley | Countrywide Home Loans |
| CWHL 2006-OAS 2A3 | File No: 333-125963 Original: 6/20/2005 Amended: 7/25/2005 | Standford Kurland Eric Sieracki David Spector | 1/25/2006 | CHL Mortgage Pass-Through Trust 2006-OA5 | CWMBS, Inc. | UBS Securities LLC | Countrywide Home Loans |
| CWHL 2007-X A18 | File No: 333-140958 Original: 2/28/2007 Amended: 4/24/2007 | Joshua Adler Eric Sieracki Ranjit Kripalani Jennifer Sandefur | 7/27/2007 | CHL Mortgage Pass-Through Trust 2007-14 | CWMBS, Inc. | Banc of America Securities LLC Lehman Brothers Inc. | Countrywide Home Loans |
| CWHL 2007-17 3A1 | File No. 333-140958 Original: 2/28/2007 Amended: 4/24/2007 | Joshua Adler Eric Sieracki Ranjit Kripalani Jennifer Sandefur | 7/27/2007 | CHL Mortgage Pass-Through Trust 2007-17 | CWMBS, Inc. | Countrywide Securities Corporation | Countrywide Home Loans |
| CWHL 2007-18 2A1 | File No. 333-140958 Original: 2/28/2007 Amended: 4/24/2007 | Joshua Adler Eric Sieracki Ranjit Kripalani Jennifer Sandefur | 7/27/2007 | CHL Mortgage Pass-Through Trust 2007-18 | CWMBS, Inc. | Countrywide Securities Corporation | Countrywide Home Loans |
| BOAMS 2007-3 1A1 | File No: 333-132249 Original: 3/7/2006 Amended: 5/12/2006 | Adam D. Glassner Michael J. Kula Juliana C. Johnson Robert Caruso | 8/29/2007 | Banc of America Mortgage 2007-3 Trust | Banc of America Mortgage Securities, Inc. | Banc of America Securities LLC | Banc of America Mortgage Securities, Inc. |

{2481 / CHT /00107596.DOC-v2}

## EXHIBIT 2: TOLLING CHART LISTING WHICH SECURITIES AT ISSUE IN FEDERATED WERE INCLUDED IN EARLIER COMPLAINTS

| Certificate Offering | Included in 2007 *Luther* | Included in June 2008 *Washington State* | Included in October 2008 *Luther* | Included in January 2010 *Maine State* |
|---|---|---|---|---|
| CWALT 2005-51 | Yes | Yes | Yes | Yes |
| CWHL 2005-21 | No | Yes | Yes | Yes |
| CWHL 2006-OA5 | No | Yes | Yes | Yes |
| CWHL 2007-14 | No | Yes | Yes | Yes |
| CWHL 2007-17 | No | Yes | Yes | Yes |
| CWHL 2007-18 | No | Yes | Yes | Yes |

{2481 / CHT / 00108117.DOC v2}

11/01/22

# EXHIBIT 3- FEDERATED (MBS): CREDIT RATINGS ON COUNTRYWIDE AND BANK OF AMERICA LOAN CERTIFICATES

Ratings Past and Present

| Certificate | Original S&P Rating | Current S&P Rating | Original Moody's Rating | Current Moody's Rating |
|---|---|---|---|---|
| CWALT 2005-51 3AB3 | AAA | CC(sf) | Aaa | C(sf) |
| CWHL 2005-21 A2 | | | Aaa | B3(sf) |
| CWHL 2006-OA5 2A3 | AAA | CC(sf) | Aaa | C(sf) |
| CWHL 2007-14 A18 | AAA | B+*(sf) | Aaa | Ca(sf) |
| CWHL 2007-17 3A1 | AAA | CCC(sf) | | |
| CWHL 2007-18 2A1 | AAA | CCC(sf) | | |
| BOAMS 2007-3 1A1 | AAA | CCC(sf) | | |

S&P: AAA is the highest investment grade rating; AA+, AA,AA- are all high grade; A+, A, and A- are upper medium grade; BBB+,BBB,BBB- are lower medium grade. Any grade below BBB- is non-investment grade.

Moody's: Aaa is the highest investment grade rating. Aa1,Aa2,and Aa3 are high grade: A1,A2and A3 are upper medium grade; Baa1,Baa2 and Baa3 are lower medium grade. Anything below this is non-investment grade.

{2481 / CHT / 00108175.DOC v3}

